**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jay Vee WANLESS, a/k/a William Earl
Wanless, Douglass Scott Tompkins,
Linda Aune, and Michael Eugene Beck,
Defendants–Appellants.**

Nos. 88–3037, 88–3038, 88–3039
and 88–3045.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted
December 13, 1988.

Decided Aug. 23, 1989.

**1460**

Phillip J. Wetzel, Spokane, Wash., for defendant-appellant Linda K. Aune.

Gene E. Hamilton, Spokane, Wash., for defendant-appellant Jay Vee Wanless.

Richard C. Agman, Spokane, Wash., for defendant-appellant Douglass Scott Tompkins.

Richard B. Kayne, Spokane, Wash., for defendant-appellant Michael Eugene Beck, aka Frank Eugene Stone.

Earl A. Hicks, Asst. U.S. Atty., Spokane, Wash., for plaintiff-appellee.

Before WRIGHT, PREGERSON and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Four appellants challenge the district court's denial of a motion to suppress certain evidence obtained through inventory and investigatory searches of two automobiles. The appellants contend that because the police did not inform the owner of the vehicles that he did not have to consent to the inventory search, the evidence resulting from the search should have been suppressed. They also contend that the remaining evidence was insufficient to establish probable cause to allow the police to search the two vehicles. We agree.[1]

### FACTS [2]

After being alerted by an air traffic patrol, Troopers Pass and Ahren of the Washington State Patrol stopped two vehicles for speeding on Interstate 90 near Spokane. The first vehicle was a green 1953 Chevrolet with two occupants; appellant Douglass Scott Tompkins was driving and appellant Jay Vee Wanless was the passenger. The second vehicle was a black El Camino, also with two occupants; the El Camino was being driven by appellant Michael Eugene Beck, and appellant Linda K. Aune was the passenger.

After stopping the two cars, Trooper Pass asked Tompkins, the driver of the Chevrolet, for identification. Tompkins was unable to provide the trooper with a driver's license or other papers. He also could not supply either registration or title

---

1. The district court had jurisdiction of this case pursuant to 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2. We have jurisdiction pursuant to 28 U.S.C. § 1291.

2. Because we do not find that any of the findings of fact made by the district court in this case were clearly erroneous, *see United States v.*

*Warner,* 843 F.2d 401, 403 (9th Cir.1988), the facts stated herein are a summary of the district court's findings as stated in that court's Findings of Fact and Conclusions of Law and Supplemental Findings Of Fact And Conclusions Of Law On The Motion To Suppress.

for the car. Tompkins did, however, inform Trooper Pass that he was driving the Chevrolet to Portland for the driver of the El Camino. When the trooper asked Tompkins who his passenger was, Tompkins stated that he knew him only as "Jay". Trooper Pass then arrested Tompkins for driving without a license, took him into custody, and placed him in the back of Trooper Ahren's patrol car.

Trooper Pass then returned to the Chevrolet to interrogate the passenger, who identified himself as William Earl Wanless. When the trooper asked him for his birthdate, Wanless hesitated before responding. Trooper Pass thought that Wanless was lying about his birthdate and perhaps his name, as Tompkins had indicated that his passenger's first name was "Jay". Wanless was unable to provide any form of identification. At this point, the trooper arrested Wanless for giving false information to a police officer and read him his *Miranda* rights.

Trooper Pass then proceeded to search Wanless. The pat-down produced a syringe cap and an empty "bindle." The trooper also noticed that Wanless had needle marks on his arm. When asked when he had last "shot up", Wanless replied "2 days ago."

While Trooper Pass was interrogating the occupants of the Chevrolet, Trooper Ahren was questioning the driver and passenger of the El Camino. The driver, who pleaded guilty under the name Michael Beck, identified himself as Frank Eugene Stone, but was unable to produce a driver's license or other form of identification. The passenger, who identified herself as Linda Aune, did produce a Portland identification card, but no driver's license. Appellant Beck was subsequently arrested for operating a vehicle without a license and was placed in the patrol car with Tompkins. Linda Aune remained in or near the El Camino.

Because none of the occupants of the two cars had a valid driver's license, no one was capable of driving the cars off the interstate highway. Furthermore, appellants did not indicate that any of them had any friends or relatives in the area whom they could call to take possession of the vehicles. Accordingly, the troopers decided to impound the vehicles in accordance with standard Washington State Patrol procedures. Trooper Pass radioed for two tow trucks and then began an inventory search of the contents of the vehicles.

The Chevrolet was the first vehicle to be inventoried. Trooper Pass' inventory began in the unlocked glove box, where he found a mirror with white residue on it, which he thought was probably a controlled substance. Above the passenger compartment visor, he found a dentist's-type mirror. At this point, Pass believed that the car probably contained other contraband and decided to delay the search until he obtained advice from his sergeant, whom he radioed to come to the scene.

While waiting for the sergeant to arrive, Trooper Pass commenced an inventory search of the El Camino. In the glove box, Pass found a spoon with burn marks and residue on it. The trooper also found cigarette papers on the floor or front seat of the El Camino. At this point, the trooper stopped the inventory search and asked appellants Tompkins and Beck if he could search both vehicles. Both appellants refused consent.

Approximately twenty minutes later, Sergeant Larsen arrived at the scene. Troopers Pass and Ahren told Larsen their findings. Sergeant Larsen then telephoned a deputy prosecuting attorney for Spokane County who, upon being advised of the facts as detailed above, recommended that the officers proceed with the search.

Based on the advice of the deputy prosecutor, Trooper Pass again undertook a search of the vehicles. He testified that, at this point, he was not continuing his previous inventory search, but rather was conducting an investigatory search for drugs. In searching the Chevrolet, Trooper Pass discovered the following items: (1) a sack under the front seat which contained a syringe and beer; (2) a loaded handgun; and (3) an unlocked blue socket box which contained green vegetable matter, which he believed from his experience to be marijua-

na. He then terminated his search of the Chevrolet.

Trooper Pass then turned to the El Camino. His investigative search of this car uncovered a closed camera case which, when opened on the scene, was found to contain scales, a razor, a mirror, and a white powdery substance, which he believed was an illegal drug.[3] He also believed, from his experience, that the scale was of a type commonly used for weighing drugs. No further searches of the two vehicles took place at the scene.

The two vehicles were then towed to the State Patrol Building, where the troopers prepared a telephonic warrant. The affidavit supporting the application contained the information as to the evidence found in the initial inventory searches of the two vehicles, as well as the evidence found during the investigative searches. A search warrant was issued. The subsequent search of the two cars uncovered 530 grams of methamphetamine, various chemicals used in the manufacture of methamphetamine, glassware, tubing and other laboratory items, and a number of handguns.

Drug charges were brought against all four of the appellants. The district court denied the appellants' motion to suppress the evidence found during the inventory and investigatory searches. After the denial of the motion, appellants Aune and Wanless pleaded guilty to possessing methamphetamine under 21 U.S.C. § 844, while appellants Tompkins and Beck pleaded guilty to a single count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. All of the appellants' guilty pleas were conditional; they each reserved the right to appeal the denial of the motion to suppress the evidence. This appeal timely followed.

## DISCUSSION

### A.

### The Inventory Searches

■ As a preliminary matter, we note that all four appellants have challenged the inventory searches of the two vehicles. Because Fourth Amendment rights are personal and may not be vicariously asserted, *Rakas v. Illinois*, 439 U.S. 128, 133, 99 S.Ct. 421, 424–25, 58 L.Ed.2d 387 (1978), as a general rule, only the owner of the vehicles or an individual with a legitimate privacy interest in the vehicles may challenge an allegedly illegal search. *See United States v. Broadhurst*, 805 F.2d 849, 851–52 (9th Cir.1986). Here, the district court found that each of the appellants satisfied this requirement. However, we need not decide whether the district court was correct, because the government has never challenged, either at the suppression hearing or on appeal, the right of any of the appellants to contest the inventory searches.

■ Prior to 1978, the question whether an individual had the right to challenge a particular search was a question of standing, and hence jurisdictional. *See, e.g., Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). However, in *Rakas*, the Supreme Court held that the question whether an individual was entitled to contest the validity of a search should be analyzed "under substantive Fourth Amendment doctrine [rather] than under the heading of standing." *Rakas*, 439 U.S. at 139–40, 99 S.Ct. at 428; *see also United States v. Broadhurst*, 805 F.2d 849, 851 (9th Cir.1986). Accordingly, the question of whether any of the appellants may challenge the inventory searches is "not a threshold jurisdictional question," *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir.1980), *cert. denied*, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981), and the failure of the government to raise the issue results in its waiver. *United States v. Nechy*, 827 F.2d 1161, 1164–65 (7th Cir. 1987) (failure of government to raise question of Fourth Amendment standing either at trial or on appeal resulted in waiver). As the government in this case has not challenged the right of any of the appel-

---

**3.** The mirror had the initials L.K.A. which the Trooper recognized as the initials of Linda Kay Aune. She was subsequently arrested for illegal possession of a controlled substance.

lants to object to the inventory searches, it has waived any objection it might otherwise have had.[4]

■ Turning to the merits of the appellants' arguments, it is undisputed that once a vehicle has been impounded, the police may conduct an inventory search. *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1975). The reasons for conducting the inventory search are threefold: (1) the protection of the vehicle owner's property; (2) the protection of police against claims by the owner; and (3) the protection of the police from potential danger. *Id.* However, in order to ensure that the inventory search is "limited in scope to the extent necessary to carry out the caretaking function," it must be carried out in accordance with the standard procedures of the local police department. *Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100; *see also Colorado v. Bertine*, 479 U.S. 367, 374 n. 6, 107 S.Ct. 738, 742 n. 6, 93 L.Ed.2d 739 (1987). Accordingly, to determine whether the evidence secured through the inventory searches of the vehicles in this case is admissible in federal court, we must determine whether the searches were conducted in accordance with the standard procedures of the Washington State Patrol.

Under § 3.03.160 of the Washington State Trooper's manual, the department is required to conduct an inventory search of "[a]ny vehicle lawfully in the custody of the Washington State Patrol." Here, the troopers apparently were authorized to impound the two vehicles used by the four appellants because none of them had a valid driver's license and, from the answers given to the questions posed by the troopers, the troopers could reasonably assume that none of them had a friend or relative in the Spokane area who could remove the vehicles from the highway. *See* R.C.W. § 46.20.435(1).

■ However, we need not decide whether impoundment of the two vehicles was proper. Although the language of § 3.03.160 appears to make mandatory an inventory search of an impounded vehicle, the Washington courts have placed a limitation on the search requirement. Under Washington law, State troopers may not conduct a routine inventory search following lawful impoundment of a vehicle without first asking the owner, if present, if he will consent to the search. *See State v. Williams*, 102 Wash.2d 733, 689 P.2d 1065, 1071 (Wash.1984); *see also Survey of Washington Search & Seizure Law: 1988 Update*, 11 U. Puget Sound L.Rev. 411, 578 (1988); *compare United States v. Lyons*, 706 F.2d 321, 335 n. 23 (D.C.Cir.1983). An individual is free to reject the protection that an inventory search provides and take the chance that no loss will occur. *See Williams*, 689 P.2d at 1071. Here, the appellants argue that, although the police knew that Beck was the owner of the vehicles[5], he was not afforded the opportunity to decide whether he wanted to have an inventory search conducted. The government ignores this small, but ultimately pivotal, point. The record does not indicate that Beck was ever asked whether he would give permission for the inventory searches and the government makes no claim that he was.[6] Thus, we must con-

---

**4.** Our decision in *United States v. Kinsey,* 843 F.2d 383 (9th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 2882, 101 L.Ed.2d 916 (1988), is not to the contrary. In *Kinsey,* the government failed at trial to raise the question of the defendant's Fourth Amendment standing. *Id.* at 391. Nevertheless, we held that the government had not waived its right to challenge the defendant's Fourth Amendment standing because it properly raised the issue on appeal. *Id.* at 389–90; *see also United States v. Robertson,* 833 F.2d 777, 779 (9th Cir.1987) (same). Here, the government failed both at trial and on appeal to challenge the appellants' right to contest the validity of the inventory searches.

**5.** At the very least, the troopers knew that Beck claimed to be the owner of the two vehicles. In any event, the government has never challenged Beck's assertion that he did in fact own the vehicles.

**6.** The government appears to suggest that, if asked, Beck would have consented to an inventory search of the two cars. However, the government points to no evidence to support this suggestion. Indeed, the only evidence in the record suggests that the exact opposite is true. When Trooper Pass asked for permission to search the two vehicles, both Beck and Tompkins refused to consent. Supplemental Findings Of Fact And Conclusions Of Law, January 12,

clude that Beck was never given the opportunity to "reject [the] protection" afforded by an inventory search. *Williams,* 689 P.2d at 1071. Accordingly, the resulting inventory searches were illegal.[7]

The government contends that *United States v. Chavez–Vernaza,* 844 F.2d 1368 (9th Cir.1987), requires this court to find that the inventory searches of the two vehicles were proper. This contention is without merit. In *Chavez–Vernaza,* we held that evidence that is obtained in accordance with federal law is admissible in federal court even though it was obtained in violation of state law. *Id.* at 1374. However, as *Opperman* and *Bertine* make clear, the *federal* law on inventory searches by state or local police officers is that they must be conducted in accordance with the official procedures of the relevant *state or local* police department. *See also United States v. Woolbright,* 831 F.2d 1390, 1394 (8th Cir.1988) (validity of inventory search performed by county police officers determined by considering county police procedures). The procedures of the Washington State Patrol for conducting an inventory search were not followed here; appellant Beck was not granted the opportunity to choose whether to permit or refuse to permit the inventory searches. Accordingly, as we have already indicated, those searches of his cars and the resulting seizures of evidence were illegal.[8]

The evidence obtained as a result of the illegal inventory searches was the following: (1) the mirror with white powdery residue found in the glovebox; (2) the dentist mirror found above the visor; (3) the

spoon with burn marks and residue on it; and (4) the "Zig Zag" cigarette papers found in the passenger area of the El Camino.[9] That evidence must be suppressed.

## B.

### The Investigatory Searches

We next turn to the validity of the investigatory searches for contraband which followed the inventory searches. Even if police officers have legitimately stopped a vehicle, as was the case here, the officers may search the vehicle only if they have probable cause to do so. *United States v. Parr,* 843 F.2d 1228, 1232 (9th Cir.1988). Accordingly, the investigatory searches will withstand constitutional challenge only if the facts legally known by the troopers would "warrant a man of reasonable caution in the belief that an offense has been or is being committed," *Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979), or more specifically, in the belief that the vehicles contained contraband. *Parr,* 843 F.2d at 1232. In determining that the investigatory searches were valid, the district court relied on the following facts:

1. The two vehicles were traveling together.

2. None of the occupants had any identification or operator's license except Linda Aune, who had a Portland identification card.

3. The only registration or title to the vehicles which was produced was a signed-

---

1988 at 6–7. Thus, the government falls far short of carrying its burden on this point.

**7.** The dissent suggests that there is no evidence that Washington State Troopers are instructed to request the consent of vehicle owners before conducting inventory searches. We think that in determining what the rules are in a particular state, it is not only appropriate but necessary to rely on the statements of the state Supreme Court. We think it fair to presume that Washington State Troopers, as a matter of course, follow Washington law as set forth by the state's highest court.

**8.** Because we conclude that the inventory searches were illegal for the reason that the

troopers failed to get the vehicle owner's consent, we need not decide the appellants' further contention that the troopers did not follow other Washington State Patrol procedures during the course of the inventory searches.

**9.** It is possible that the troopers may have discovered the "Zig Zag" cigarette papers through legal means, namely through "plain view". However, the government has never contended that the cigarette papers were found in that manner or sought to rely on the plain view doctrine. Accordingly, we must assume that they were found as a result of an unlawful inventory search.

off title to the El Camino, not in the name of any of the four individuals.

4. Douglass Tompkins identified his passenger as "Jay." The passenger stated his name was William Earl Wanless and he was hesitant in responding to the question as to his birthdate.

5. Jay Wanless stated he was traveling to Seattle, Washington, while the others informed the troopers that they were traveling to Portland, Oregon.

6. Jay Wanless had needle marks on his arm.

7. Jay Wanless informed Trooper Pass that he had "shot up" 2 days before.

8. Upon his arrest, Jay Wanless had a syringe cap in his pocket and also an empty "bindle" which Trooper Pass associated with drug use.

9. "Zig Zag" cigarette papers were found in the passenger compartment of the El Camino.

10. A mirror with a white powder residue was found during the inventory search of the 1953 Chevrolet.

11. A dentist's mirror was found during the inventory search of the Chevrolet.

12. A spoon with burn marks and residue was found during the inventory search of the El Camino.

It is now fundamental that evidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search. *See United States v. Vasey,* 834 F.2d 782, 788 (9th Cir.1987); *United States v. Roberts,* 747 F.2d 537, 541 (9th Cir.1984); *see also Wong Sun v. United*

*States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). As we have already discussed, items 9 through 12 were discovered as a result of the illegal inventory searches. Thus, the district court improperly relied on that evidence in determining that the troopers had probable cause to conduct investigatory searches of the Chevrolet and the El Camino. At the most, only items 1 through 8 should have been considered.

Before we turn to the issue whether items 1 through 8 establish probable cause for the troopers to search the two vehicles, we note that the district court concluded that the troopers did not have probable cause to arrest Wanless and that the resulting search of his person was illegal. We agree.[10] This raises the question whether the district court also erred when it relied on the evidence seized as the result of Wanless's arrest, namely the syringe cap and the empty "bindle", in deciding that the troopers had probable cause to search the two vehicles.[11] However, we need not resolve this issue, because even considering the evidence seized through the unlawful search of Wanless, we conclude that the evidence is far too scanty to establish probable cause for an investigative search of the two vehicles.

Although the evidence described in items 1 through 8, *supra,* might justify the troopers in being suspicious, it would not lead a reasonably cautious person to believe that the vehicles contained contraband.[12] While of course we consider the evidence as a whole, we first observe that items 1 through 5, although they might justify

10. We also note that the record would not justify a frisk search of Wanless incident to the lawful traffic stop. A search of an individual incident to a lawful stop is justified only if "a reasonably prudent person in the circumstances would be warranted in the belief that his or her safety or that of others was in danger." *United States v. Thomas,* 844 F.2d 678, 683 (9th Cir. 1988). Nothing in the record suggests that Wanless posed any threat to the officers or that the officers ever believed that their safety was in jeopardy.

11. Clearly, evidence obtained as a result of reliance on the bindle and syringe cap may not be

used with respect to Wanless; the question is whether such evidence may be used against the other defendants.

12. We review this question *de novo United States v. Merriweather,* 777 F.2d 503, 505 (9th Cir.1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986). We note, however, that the district court never decided whether items 1 through 8 alone established probable cause for the investigative searches, since it based its decision on items 1 through 12 collectively.

some suspicion that something could be amiss, would not in and of themselves suggest that either of the two vehicles contained contraband or even that criminal wrongdoing was involved. In fact, most of the first 5 items are quite innocuous.

Items 6, 7, and 8 are of a different nature. Those items involve the "track marks" on Wanless's arm, Wanless's comment that he had last "shot up" two days before, and the syringe cap and empty bindle found on his person. These items constituted the only evidence that any of the appellants was in any way connected to any narcotics use or activity, and it was severely limited in scope. While the evidence may have justified the troopers' suspicion that Wanless used drugs, it does not rise to the level necessary to establish probable cause to believe that the vehicles (in one of which Wanless was a passenger) contained contraband. The troopers did not detect any drug or drug-related odors, *see United States v. Miller*, 812 F.2d 1206, 1208–09 (9th Cir.1987); *United States v. Solomon*, 528 F.2d 88, 91 (9th Cir.1975); nor did they see any items that they could reasonably believe were controlled substances. *See United States v. Garcia–Rodriguez*, 558 F.2d 956, 965 (9th Cir.1977), *cert. denied*, 434 U.S. 1050, 98 S.Ct. 900, 54 L.Ed.2d 802 (1978). In addition, as the district court found, "[t]here is no evidence whatsoever that any of the state troopers had any prior information or intelligence about any of these individuals." *See United States v. Vasey*, 834 F.2d 782, 788 (9th Cir.1987); *Miller*, 812 F.2d at 1209.

We believe that *Vasey* is particularly instructive. In that case, the police had obtained a warrant to search a vehicle based in part on illegally seized evidence. After that evidence was excluded, the only evidence which could support the issuance of the search warrant was the following: (1) the defendant acted furtively in the car and appeared to be hiding something between the seats; (2) he had an outstanding arrest warrant on a drug-related charge; (3) he was carrying over $1000 in cash; (4) the officer noticed a sealed container of pills in the car; and (5) the police officer had several years of experience. 834 F.2d at 788.

We held that that evidence was "insufficient to establish probable cause." *Id.* We believe that the evidence in this case is even less compelling than that in *Vasey;* at the very least, it is certainly no more probative of the presence of contraband in the two vehicles. Even if the evidence here would, as in *Vasey*, justify the troopers' suspicion that there were illegal substances in the two cars, "[m]ere suspicion does not rise to the level of probable cause." *Vasey*, 834 F.2d at 788. Accordingly, we hold that the investigatory searches of the two vehicles were illegal.

### C.

### Good Faith and Inevitable Discovery

 We next turn to the searches conducted after the issuance of the telephonic warrant. First, the government contends that under the good faith exception to the exclusionary rule, the evidence seized after the issuance of the warrant was properly admitted. Under the good faith exception, evidence seized by an officer who reasonably relied on a search warrant that is later deemed to be invalid is admissible if the officer acted in "good faith." *United States v. Leon*, 468 U.S. 897, 919–21, 104 S.Ct. 3405, 3418–19, 82 L.Ed.2d 677 (1984). The government apparently argues that this exception should apply because the affidavit in support of the warrant contained no misrepresentations. This argument misperceives the "good faith" exception. The mere fact that the officer requesting the warrant is truthful about the evidence he submits in support of the warrant is insufficient. We have recently decided that the good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search. *Vasey*, 834 F.2d at 789. In *Vasey*, we held that "[t]he fact that [the officer] conducted a warrantless search of the vehicle which violated [the defendants'] Fourth Amendment rights precludes any reliance on the good faith exception." *Id.* Here, because the search warrant was issued in part on the basis of evidence obtained from an il-

legal search of the vehicles, the "good faith" exception does not apply; the search pursuant to the warrant would be valid only if the legally obtained evidence, standing alone, was sufficient to establish probable cause. We have already held that it is not.[13]

██ The government also argues that the evidence should be admissible under the inevitable discovery doctrine. Under this doctrine, evidence that would normally be excluded will be admitted if the prosecution is able to show by a preponderance of the evidence that the materials unlawfully seized would inevitably have been discovered by lawful means. *United States v. Andrade,* 784 F.2d 1431, 1433 (9th Cir.1986). Here, the government argues that the evidence would have been inevitably discovered if Trooper Pass had continued his inventory searches rather than stopping and waiting for advice from his supervisor and a deputy prosecutor. The fallacy in this argument is that, as we have already discussed, the inventory searches conducted by Trooper Pass were unlawful. See pages 1463–64, *supra.*

The government also contends that the evidence would have inevitably been discovered as the result of an investigative search of the two vehicles after Trooper Pass completed the inventory searches. This argument is also answered by our earlier holding *supra* at page 1464.

## CONCLUSION

The district court's denial of appellants' motion to suppress is reversed. We vacate the appellants' convictions. The case is remanded to the district court with instructions to grant the appellants' motion and for further proceedings consistent with this opinion.

### REVERSED AND REMANDED

**13.** More specifically, the information given to support the telephonic warrant included items 1 through 12 and the evidence seized during the unlawful first investigative search. The government contends that the items seized prior to the first investigatory search, i.e., items 1 through 12, establish probable cause to support the warrant. However, as we have already discussed,

**EUGENE A. WRIGHT, Circuit Judge, dissenting:**

The majority concludes that, because the police conducted the inventory searches without first obtaining the vehicle owner's consent, as required by Washington state law, the district court should have suppressed the evidence resulting from the searches. I dissent because the majority relies erroneously on state law rather than federal law. Moreover, it is unclear whether Washington state law requires that police give car owners the option of consenting or not consenting to an inventory search.

In *United States v. Chavez–Vernaza,* 844 F.2d 1368, 1374 (9th Cir.1987), this court held that evidence seized by state officials in compliance with federal law is admissible in federal court without regard to state law. As the majority notes, federal law regarding an inventory search by state or local police officers requires that it be carried out in accordance with standard procedures of the local or state police department conducting the search. *See South Dakota v. Opperman,* 428 U.S. 364, 375, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1975). The majority decides, however, based only on a Washington Supreme Court case, that the State Patrol failed to follow standard state procedures because Trooper Pass neglected to request the owner's consent prior to conducting the inventory searches. *See State v. Williams,* 102 Wash.2d 733, 743, 689 P.2d 1065, 1071 (1984).

By relying on Washington state case law, the majority defines "standard procedures" to include state court rulings regarding search and seizure practices of state police. This is tantamount to incorporating implicitly by reference all of Washington state search and seizure law. The majority

items 9 through 12, which were seized as the result of the illegal inventory search, must be suppressed and may not be used to establish probable cause for a later search. Thus, only items 1 through 8 may be considered, and, as we have also already held, that evidence falls short of establishing probable cause.

thereby reaches a result indirectly that *Chavez–Vernaza* does not allow the court to reach directly.

Here, the Washington State Trooper's Manual sets forth the procedures officers must follow when impounding a car and conducting an inventory search. It says nothing about first requesting the consent of the vehicle's owner. Nor was any evidence presented that officers, as part of their standard procedures, are instructed to offer the owner an opportunity to consent to an inventory search. There is no basis on which to conclude that failure to request such consent violates the standard procedures of the Washington State Patrol.[1]

In order to establish that the inventory searches were conducted in accordance with standard procedures, the court must, and I would, conclude that the police impounded the vehicles properly. As noted by the majority, section 3.03.160 of the Washington State Trooper's Manual states that the department shall conduct an inventory search of "[a]ny vehicle lawfully in the custody of the Washington State Patrol." The manual further provides in section 3.03.140 that, if a person is arrested for driving without a valid driver's license, the vehicle must be impounded or released to a qualified driver. Here, none of the four appellants had a valid driver's license. Nor did any of them indicate that they had friends or relatives in the area to whom the officers could release the vehicles. The troopers impounded the vehicles properly according to standard procedures of the Washington State Patrol.

Furthermore, the majority relies exclusively on dictum in *Williams* to support its position. The opinion concludes that, based on *Williams*, Washington state law requires police to seek an owner's consent before conducting an inventory search. The statement to that effect in *Williams* is dictum because that court held that the impoundment of the vehicle was unauthorized. The Washington courts have not yet squarely addressed the issue on which the majority bases its opinion.

Relying on federal law, the court should determine that there is no consent requirement. Although no federal cases have addressed the issue directly,[2] the Supreme Court has indicated its disapproval of the consent requirement. In *South Dakota v. Opperman*, 428 U.S. 364, 376 n. 10, 96 S.Ct. 3092, 3100–3102 n. 10, 49 L.Ed.2d 1000 (1975), the majority rejected the dissent's theory that, absent specific consent, an inventory search is permissible only in exceptional circumstances. The Court emphasized that, in addition to protection of the vehicle owner's property and of the police from potential danger, the purpose of inventory is to: (1) protect the municipality and officers from claims of lost or stolen property; and (2) protect the public from vandals who might find a firearm or other contraband. *Id.* The Court rejected the consent theory as inconsistent with the purpose of inventory searches, although that precise issue was not before it. If the majority here had properly applied federal law, as required by *Chavez–Vernaza*, it would have to reach a different result as to suppression of the evidence.

Because the district court properly considered items 9–12 of the evidentiary facts listed in the majority opinion, I conclude that there was probable cause to conduct an investigative search. *See United States v. Ross*, 456 U.S. 798, 800, 102 S.Ct. 2157, 2160, 72 L.Ed.2d 572 (1982); *United States*

---

1. Appellants contend that Trooper Pass violated several other standard procedures, e.g., failing to list contraband, valuables, or any other items of property on the vehicle inventory record, neglecting to note on the vehicle report areas he did not inspect or inventory, etc. The record indicates, however, that Trooper Pass suspended his inventory search of the vehicles upon discovering evidence of contraband. There is no requirement that an officer complete an inventory search after discovering evidence sufficient to initiate an investigatory search. *See United*

States v. Woolbright, 831 F.2d 1390, 1394 (8th Cir.1987). This contention must fail.

2. Two circuits have indicated support for the consent theory, *see United States v. Lyons*, 706 F.2d 321, 335 (D.C.Cir.1983) (dictum); *United States v. Wilson*, 636 F.2d 1161, 1165 (8th Cir. 1980), and one circuit has rejected it, *see United States v. Edwards*, 577 F.2d 883, 894 n. 23 (5th Cir.) (en banc) (alternative holding) (per curiam), *cert. denied*, 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978).

*v. Parr,* 843 F.2d 1228, 1232 (9th Cir.1988). I would affirm the judgment of the district court.