**UNITED STATES of America, Plaintiff,**

v.

**Joseph T. BRADY, Charlotte Irene Brady, Defendants.**

**Nos. CR–89–412–JLQ, CR–89–413–JLQ.**

United States District Court, E.D. Washington.

March 20, 1990.

Ronald W. Skibbie, Asst. U.S. Atty., Spokane, Wash., for plaintiff.

Charles A. Baechler, Vance W. Peterson, Spokane, Wash., for defendants.

## MEMORANDUM OPINION RE: MOTION TO SUPPRESS

QUACKENBUSH, Chief Judge.

On March 16, 1990, this court issued an Order denying defendants' Motions to Suppress, and informing counsel that the court

would file a Memorandum Opinion setting forth the reasons for that decision.

Defendants assert that the search of their property on October 26, 1989 was an illegal search in violation of the Fourth Amendment, and that therefore all the fruits thereof, *i.e.*, a marijuana grow operation, should be suppressed. The search was conducted pursuant to a search warrant issued by Judge Richards, a State of Washington District Court Judge. It was based upon informants' tips, a prewarrant police surveillance, entry onto the property, and power records. There was no participation by any federal agent in the investigation or search.

Defendants assert that the informants cannot pass the Aguilar–Spinelli test of reliability, that the prewarrant entry onto the defendants' property violated the Fourth Amendment, that the power records were inconclusive, and therefore there was not probable cause to support the warrant.

## FACTUAL BACKGROUND

On September 20, 1989, Detective David B. Madsen, of the Spokane County Sheriff's Department, received information from Tim Trout, of the Idaho Bureau of Narcotics, of a possible marijuana growing operation. Officer Trout had obtained information about the operation while executing a search warrant at a Coeur d'Alene, Idaho residence. The occupants of the Idaho residence indicated to Trout that they knew of another marijuana grower, named Charlotte. A second informant informed Officer Trout that the subject named Charlotte would be one Charlotte Brady, who lived with her husband, Joseph Brady. The second informant described the residence where the Bradys lived, gave directions to reach it, and reported that the Bradys had complained about the high power that they were having to pay for growing marijuana at their house. The informants indicated that there were approximately 300 plants in a building behind the main house, referred to as a bunkhouse.

Detective Madsen and Sergeant Myhre followed the directions given by the informants and located a house and outbuildings meeting the description provided. They did not, at that time, enter the property, but limited their observations to scanning the property through binoculars. The front gate to the driveway was closed, and there appeared to be no one at home. Detective Madsen then called Inland Power and Light and ascertained that power to the subject residence was billed to Joseph Brady, who had opened the account in July 1988. Electric power consumption for the residence had increased from 760 kwh per month the first 2 months of the Brady's residency, to an average of 3230 kwh per month for the next 12 months, through September 1989.

A few days before October 25, 1989, deputy Tim Madsen drove to the Brady residence and observed the house from adjoining property. He was not able to observe any suspicious activity. In the late afternoon of October 25, 1989, at approximately 4:00 p.m., deputies Rick vanLeuven and Tim Madsen, of the Spokane County Sheriff's Department, returned to the Brady residence. When they arrived, the driveway gate was closed but not locked. They entered the property through an open area next to the gate. They then walked up the drive to the door on the North side of the house and knocked. Receiving no answer, they walked around to the West side of the house and knocked at the door there. Again receiving no answer, they began to walk toward the bunkhouse located about 15 yards directly behind the house, at which time they heard a buzzing sound coming from that building. They recognized the sound as being similar to the sound of electric ballasts used in marijuana operations to run 1000 watt halide lights. As they started to walk from the house to the bunkhouse they smelled what they recognized as growing or freshly harvested marijuana coming from the bunkhouse. The smell got stronger as they drew closer to the bunkhouse. In addition, they observed condensation on the inside of a glass window which was boarded up on the inside, which they recognized as a common effect of the high humidity caused by indoor marijuana growing operations. The doors to the bunkhouse were closed. The

officers called out to see if anyone was home, and then checked the garage. They did not go into any of the buildings. They then left the scene and obtained a search warrant. A warrant was granted by a state court judge on October 26, 1989, and a subsequent search of the premises disclosed both growing and packaged marijuana in the bunkhouse, as well as growing paraphernalia, including two electrical ballasts, 1000 watt lights, scales, and packaging materials. Packaged marijuana and other materials were also found in the house.

Defendants contend that the officers violated their Fourth Amendment right to be free from warrantless searches when they entered the property on October 25, 1989. In support of that assertion, they argue that the property was fenced, with a gate across the driveway to discourage visitors, that they had a "no trespassing" sign posted on the gate and/or fence beside the gate, and that the bunkhouse behind the main dwelling was intimately connected with the family activities and was therefore within the curtilage of the household, in which they retained a reasonable expectation of privacy.

During the hearing on the motion to suppress, evidence was offered that the private drive between the public road and the Bradys' residence was approximately 50 yards in length. The residence is in a rural area, with fields and woods surrounding the house. The perimeter of the property is fenced with wire fencing, which does not in any manner obstruct observation of the property from the public road. The fence does not directly connect to the gate across the drive, in that there is a wide gap on each side of the gate which could reasonably be construed as a pedestrian path. Photographs of the property taken on October 26, 1989 do not disclose a "no trespassing" sign, and the court has found that there was no such sign on October 25, 1989. The gate was closed only when the Bradys were not at home, and occasionally at night. It did not have a lock.

With regard to the bunkhouse, there was testimony that the Bradys stored canning supplies in the front room of the bunkhouse, and that occasionally their children played in that room. This room was not locked at the time of the warrant search, although the other interior and exterior doors to the bunkhouse were locked. There was a fence connecting the detached garage to one end of the bunkhouse and a chicken coop, but the bunkhouse was not enclosed by a fence, nor was the house, other than the perimeter fence around the entire property.

## ANALYSIS

### Aguilar–Spinelli v. Totality of the Circumstances

Defendants contend that probable cause must be weighed under the stricter *Aguilar–Spinelli* test, rather than the totality of the circumstances test. In *United States v. Speaks*, 649 F.Supp. 1065, 1066 (E.D.WA 1986), this court held that, when a warrant is issued by a state court judge at the request of state officials, and where the search was conducted by state officials, without the participation of federal agents, there was for all practical purposes no federal participation in the operation, and it was conducted solely pursuant to state authority. In such a case, the court held that the federal court, when later faced with a motion to suppress the fruits of the search, must analyze the motion under both the federal and the state constitutions. Whereas under the federal analysis the court would apply the totality of the circumstances approach enunciated in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), under the Washington State Constitution the court must apply the traditional *Aguilar–Spinelli* analysis, pursuant to *State v. Jackson*, 102 Wash.2d 432, 437, 688 P.2d 136 (1984). To satisfy the first prong of the two-prong *Aguilar–Spinelli* test, the "basis of knowledge" element, "the officer's affidavit must set forth some of the underlying circumstances from which the informant drew his conclusion so that a magistrate can independently evaluate the reliability of the manner in which the informant acquired his information." *Speaks*, at 1067 (quoting *Jackson*, 102

Wash.2d at 435, 688 P.2d 136). The second prong, the "veracity" element, requires that "the affidavit must set forth some of the underlying circumstances from which the officer concluded that the informant was credible or his information reliable." *Id.* It is not disputed that the affidavit in question did not satisfy the *Aguilar–Spinelli* test applied in Washington State courts, in that the affidavit did not contain information as to how the informants obtained their information, nor did it contain information which would assist the court in evaluating the informants' credibility.

The Government contends that this court should apply only the totality of the circumstances test, without regard to state law. It relies upon *United States v. Chavez–Vernaza*, 844 F.2d 1368 (9th Cir.1987), wherein the Court of Appeals for the Ninth Circuit held that, despite the fact that evidence was seized by state officials without federal involvement in alleged violation of state law, such evidence was admissible in federal court if it was seized in compliance with federal law. Chavez had argued that evidence of his financial records had been seized in violation of Oregon statutes precluding financial institutions from providing customers' financial records. The court did not agree. It pointed out that the Ninth Circuit has consistently stated that "the admissibility of evidence obtained in violation of state law turns on whether a

federal right has been infringed, not on the presence or absence of federal involvement at the evidence-gathering stage of an investigation." *Id.* at 1373. The basis for the court's decision to join the Second and Third Circuits on this issue was that:

> requiring federal district courts to look to state law when determining the admissibility of evidence obtained in accordance with federal law would hamper the enforcement of valid federal laws and undermine the policy favoring uniformity of federal evidentiary standards. We also find no justification for excluding evidence illegally seized by state officials acting independently of federal officials while admitting such evidence in cases in which federal involvement is present.

*Id.* at 1374. *See also, United States v. George*, 883 F.2d 1407, 1412 (9th Cir.1989) (rejecting application of California law in evaluating probable cause); *United States v. Kovac*, 795 F.2d 1509, 1512 (9th Cir. 1986), *cert. denied* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987) (whether officials complied with state law is irrelevant).

■ Although *Chavez* did not specifically address rights arising under a state's constitution, as opposed to statutory or common law rights, this court finds that it is nevertheless controlling here, given its emphasis on the need for uniformity in federal evidentiary standards.[1] This court does not reach this decision without serious

---

1. While *Chavez* has not been explicitly rejected by an *en banc* panel, the rationale underlying the decision may have been called into doubt by *United States v. Wanless*, 882 F.2d 1459 (9th Cir.1989), a case which also arose in this court. However, *Wanless* itself distinguished *Chavez*. In *Wanless*, state troopers stopped two vehicles for speeding on Interstate 90. None of the occupants of the two cars had a valid driver's license. Therefore the vehicles were impounded in accordance with standard Washington State Patrol procedures. While awaiting the arrival of tow trucks the officers conducted inventory searches. The Court of Appeals held that, in order to ensure that an inventory search is limited in scope to the extent necessary to carry out the caretaking function, it must be carried out in accordance with the standard procedures of the *local* police department. Therefore, to determine whether the evidence obtained in the search is admissible in *federal* court, the court must first determine whether

the search was conducted in accordance with the standard procedures of the Washington State Patrol. *Id.* at 1463. Relying on dicta in a state of Washington case, the *Wanless* majority held that under Washington State law, State troopers may not conduct a routine inventory search following lawful impoundment of a vehicle without first asking the owner, if present, if he will consent to the search.

The *Wanless* court distinguished *Chavez* on the basis that "the *federal* law on inventory searches by state or local police officers is that they must be conducted in accordance with the official procedures of the relevant *state or local* police department. (Citations omitted.) The procedures of the Washington State Patrol for conducting an inventory search were not followed here." *Id.* at 1464. Therefore, in ruling on the admissibility of the evidence seized in the search, the court was applying federal law, not state law. The *Wanless* majority did not find a federal constitutional violation.

reservations about cases with no federal involvement being brought in federal court where the evidence might be suppressed in state court. It appears to this court that, given the present executive branch's advocacy for states' rights and no federal involvement, in fairness to local citizens where investigations are conducted solely by the state, those citizens should be entitled to application of state law. However, the Ninth Circuit has explicitly stated that state law will not be applied in federal court, without regard to whether there was any federal involvement in the investigation. Although this may be unfair, and raises some due process concerns for this court, *Chavez* is nevertheless the law in the Ninth Circuit. It is for the *en banc* Ninth Circuit or for the Supreme Court, not this court, to change the law. Accordingly, this court must apply the "totality of the circumstances" test to evaluate whether probable cause existed for the issuance of the warrant.

■ The Government contends, and this court concurs, that the officers' independent corroboration of the informants' tips, prior to requesting the warrant, is sufficient to verify their reliability under the totality of the circumstances test. The informants had described the house, the telephone number, and had given directions to the house, all of which were verified independently by the officers without their ever entering the property. Their statements regarding the Bradys' complaints about their electric bills were verified by the power company records, which disclosed usage inconsistent with normal residential use. Finally, the officers obtained substantial corroborating evidence in "plain view" when they entered the property.

### Curtilage

■ This court finds it unnecessary to determine whether there existed probable cause without any reliance on the "plain view" evidence obtained by officers VanLeuven and Madsen when they walked onto the property on October 25 and smelled marijuana and observed the condensation and buzzing noises. Defendants had no

reasonable expectation of privacy precluding the officers from approaching the outside of the house and outbuildings. There was no "no trespassing" sign posted on or near the gate. The fence was not a sight-obstructing fence. The fence did not completely enclose the property in that there was a wide gap on either side of the gate which could reasonably be construed to be a pedestrian path. The fence was not of a type which evidenced an intent to exclude strangers.

This court finds that defendants had only a limited expectation of privacy insufficient to preclude police officers from approaching the residence and knocking on the doors. Nor did they have a reasonable expectation of privacy precluding the officers from walking around the rear of the residence to knock on the back door or the door to the bunkhouse. In *United States v. Roberts*, 747 F.2d 537 (9th Cir.1984), the Court of Appeals analogized a private driveway to an open field, in which, under *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1983), no expectation of privacy legitimately attaches. The *Roberts* court stated:

> To determine whether the agents' entry onto the road was a search, we must decide whether the private road in this case is within the curtilage of Robert's residence or belongs instead in the same category as an open field. We find that an unobstructed road, akin to an open field, is not within the curtilage and that Robert's asserted expectation of privacy in the road is unreasonable by society's standards.

*Id.* at 541.

■ To determine whether the driveway and bunkhouse in the instant case are within the curtilage, or are more appropriately classified as an open field, the court must consider four factors: (1) the proximity of the area claimed to be within the curtilage of the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature and uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *United States*

*v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The primary focus is whether the area "harbors those intimate activities associated with domestic life and the privacies of the home." *United States v. Calabrese*, 825 F.2d 1342, 1350 (9th Cir. 1987). In *Dunn*, the court held that a barn located 60 yards from the home, which was not enclosed within a fence surrounding the home, although the agents had to cross several barbed wire fences as well as a locked fence in front of the barn to reach it, and which barn was not used for the intimate activities of the home or protected from observation by those standing in the open fields surrounding the barn, was not within the curtilage of the home. It rejected the idea that to fall within the "open field" category it was necessary that the subject be either a field or out in the open.

In the instant case the driveway was barred by a gate with a chain. However, the chain was not locked, and the gate was a substantial distance from the residence and was therefore not within the curtilage. There was an opening in the fence near the gate which gave easy access to pedestrians. Although there was a portion of chicken fencing between the garage and the bunkhouse, there was no separate fence limiting access to either the house or the bunkhouse. Even though the front room of the bunkhouse was used to store canning supplies and as an occasional playroom for the children, this court finds that its use was primarily for the marijuana grow operation, and that it was not closely associated with legitimate family activities.

The Bradys had boarded up the bunkhouse windows; however, the boards were on the inside, thereby leaving condensation on the glass in plain view of anyone approaching the building. The bunkhouse was approximately 45 feet from the home. *See United States v. Calabrese*, 825 F.2d 1342, 1349 (9th Cir.1987) (structure not within curtilage, given the fact that the structure was located 50 feet from home, and given officer's possession of objective data indicating that the structure was not being used for the intimate activities of the home, but was in fact being used to manufacture drugs). The officers did not enter the house or the bunkhouse on October 25, 1989. Finally, the perimeter fence was a wire fence which did not obstruct one's view in any manner.[2] It is this court's conclusion that the driveway and bunkhouse were not within the curtilage of the house.

Even were this court to find that the bunkhouse was within the curtilage, it does not find that the Bradys had an expectation of privacy which society is willing to recognize which precludes a police officer from approaching outbuildings and knocking on the door or calling out to ask if anyone is at home. The Ninth Circuit has consistently held that a police officer may approach a house and knock on the front door without a search being effected. *United States v. Roberts*, 747 F.2d 537, 542 (9th Cir.1984).[3] It is particularly true in a rural setting that society finds it reasonable that, if no answer is received at the home, one will approach outbuildings to

---

**2.** The fact that the wire fence did not obstruct an observer's view of the property, including the outbuildings, distinguishes this case from the recent Ninth Circuit decision in *Conner v. City of Santa Ana*, 897 F.2d 1487 (9th Cir.1990). In *Conner*, the district court had held that police officers violated the Conners' reasonable expectation of privacy when they scaled a sight-obscuring fence to obtain access to a yard in which derelict automobiles were stored in violation of a municipal ordinance classifying such vehicles as nuisances. That portion of the district court's decision was not appealed. The Ninth Circuit held that the officers also violated the Conner's reasonable expectation of privacy when they later broke down the fence to tow away the vehicles.

**3.** Although this court has previously held that it must apply federal law, not state law, it nevertheless notes with interest that Washington likewise recognizes a limited expectation of privacy within the curtilage. In *State v. Seagull*, 95 Wash.2d 898, 902, 632 P.2d 44 (1981), the court stated,

> The presence of an officer within the curtilage of a residence does not automatically amount to an unconstitutional invasion of privacy. Rather, it must be determined under the facts of each case just how private the particular observation point actually was. It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open.

ascertain if the resident is working there. This recognition of a very limited expectation of privacy outside the curtilage of a rural residence is supported by the Supreme Court's recognition that "open fields" applies to any unoccupied or undeveloped area outside the curtilage, whether or not it is a field, as such. *Oliver v. United States,* 466 U.S. 170, 180 n. 11, 104 S.Ct. 1735, 1742 n. 11, 80 L.Ed.2d 214 (1984); *United States v. Broadhurst,* 805 F.2d 849, 855 n. 9 (9th Cir.1986). In the instant case, it is uncontroverted that the bunkhouse was not "occupied". The officers did not attempt to enter the outbuildings; they merely knocked or called out to ask if anyone was home. Receiving no response, they immediately left the premises. A permissible intrusion is not rendered impermissible by the fact that, in the process of this legitimate limited intrusion into the curtilage and the area immediately outside it where the bunkhouse lay, they observed in plain view the smells and sounds which they associated with a marijuana grow operation.

This court concludes that, based upon the totality of the circumstances, including the informants' tips, the officer's independent verification of the location and description of the residence, of the unusually high power consumption, and that the power bills for the subject property were in fact billed to the Bradys, and the officers' independent "plain view" observation of sights and sounds which, based upon their extensive experience, they associated with a marijuana grow operation, sufficient probable cause existed to support the issuance of the warrant.

*Good Faith Exception*

■ Given the fact that this case involves a novel issue regarding whether the bunkhouse was within the curtilage, and, if so, whether the officers' approach to the bunkhouse for the purpose of knocking and announcing violated a reasonable expectation of privacy, this court holds, as an alternative holding, that the officers relied in good faith upon the warrant in conducting their search, and therefore the fruits of that search should not be suppressed. As the Ninth Circuit has stated, "If the executing officers act in good faith and reasonable reliance upon a search warrant, evidence which is seized under a facially valid warrant which is later held invalid may be admissible." *United States v. Michaelian,* 803 F.2d 1042, 1046 (9th Cir.1986). The defendants do not contend that the warrant was facially invalid. Even were this court to conclude that the officers did not reasonably rely on the affidavit to the extent it was based on information obtained during the October 25 entry, nevertheless, there was sufficient independent verification of the informants' tips to support good faith reliance on the warrant under the totality of the circumstances. Nor does this court find persuasive defendants' contention that the officers deliberately misled the court by failing to disclose in the affidavit in support of a warrant that they had conducted two off-premises surveillances without observing suspicious activity. It is not necessary that an affidavit set forth all unsuccessful efforts to discover evidence, only that it set forth the evidence which the affiant believes supports probable cause.