UNITED STATES of America,
Plaintiff-Appellee,

v.

James John ROBERTS,
Defendant-Appellant.

No. 83–3123.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 6, 1984.

Decided Nov. 14, 1984.

William H. Redkey, Jr., Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Howard Ratner, Seattle, Wash., for defendant-appellant.

Before WRIGHT, PREGERSON and CANBY, Circuit Judges.

PREGERSON, Circuit Judge:

## INTRODUCTION

Defendant James Roberts appeals his conviction for conspiring to manufacture and possess marijuana with intent to dis-

tribute in violation of 21 U.S.C. §§ 812, 846 (1982) (Count I), growing marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) (1982) and 18 U.S.C. § 2 (1982) (Count II), and possessing marijuana with the intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2 (Count III). At a bench trial, the parties stipulated that the evidence would consist of the transcript of an earlier suppression hearing and the testimony of Drug Enforcement Administration (DEA) Agent Yarborough had he been called to testify. The district court found Roberts guilty on all three counts.[1] On Count I, the court sentenced him to one year imprisonment with credit for time served. On Counts II and III, the court suspended imposition of the sentence and placed Roberts on probation for five years on each count, the five-year probationary periods to run concurrent with each other and consecutive to the sentence imposed in Count I. We affirm.

## FACTS

On December 31, 1982, DEA Agent Ben Yarborough executed a warrant on Roberts's residence, 4121 196th Ave. N.E., Redmond, Washington,[2] and found approximately 400 marijuana plants, 50 pounds of harvested marijuana, electrical equipment, halogen lights, fans, timing switches, and watering systems. Yarborough also found letters and documents addressed to Roberts and a ledger recording debts owed for marijuana purchases. Arguing that the warrant was not supported by probable cause, Roberts seeks exclusion of this evidence as the fruit of an illegal search.

United States Magistrate Sweigert issued a warrant to search Roberts's house and garage about an hour before the search was conducted. The warrant was based on an affidavit by DEA Agent Moriarty that contained information from three basic sources: (1) a tip from Randolph

Fries, arrested by the DEA on drug charges on December 22, 1982; (2) a tip from an anonymous citizen caller to the Washington State Patrol on the morning of December 31, 1982; and (3) DEA Agent Yarborough's and Washington State Trooper Jeanne Foster's observations of the exterior of Roberts's residence and the behavior of an unidentified male occupant on the afternoon of December 31, 1982.

(1) *Fries's Tip.* After his arrest, Fries told DEA agents that he wanted to cooperate and could give them information about a large marijuana growing operation. He said that he had broken into the structure where the marijuana was growing and had personal knowledge of the operation. When asked for more details, Fries told the agents that a tenant with the initials "R.D." or "R.B." ran the operation at a house Fries's brother owned.[3] Fries refused to provide additional details until he talked with an attorney and determined what benefit he could derive from his cooperation.

(2) *Anonymous Citizen Informant's Tip.* On the morning of December 31, an anonymous male called the Washington State Patrol and stated that a house in the Lake Sammamish area owned by Randy Fries's brother, Martin, had been used to grow marijuana for the past year to year and a half. Stating that he had read about Randy Fries's arrest in the newspaper, the anonymous caller suggested that Randy was involved in the operation. The caller also said that the police should move fast because the people in charge of the operation might be moving everything out of the house.

The caller described the residence as a dark brown house, the fourth one on the right hand side of 196th Ave. He added that the garage windows were sealed and that there was no frost on the garage's

---

**1.** The district court dismissed Count IV, which charged Roberts with possession of a firearm.

**2.** Hereafter referred to as "196th Ave."

**3.** The affidavit stated that Agent Yarborough's check with the Puget Power Company revealed that service for the 196th Ave. N.E. residence was in the name of R.D. Bradley.

roof even though the house's roof was frosted over.

(3) *Yarborough and Foster's Inspection of Roberts's Residence.* At 12:15 in the afternoon on December 31, Agent Yarborough and Trooper Foster drove up East Lake Sammamish Drive until they reached 196th Ave., a private dirt gravel road with signs stating "Private Road Keep Out" and "J B Ranch Fries and Randy Fries" posted at the intersection. Additional signs stating "No Hunting," "No Trespassing" and "Private Property Keep Out" were posted along 196th Ave. before it reached Roberts's residence. Knowing that the roadway was private, the agents nonetheless drove one mile up it, until they came to a house matching the anonymous informant's description. They immediately saw frost on the roof of the house but none on the roof of the garage. They also noticed that the garage windows were completely covered.

The agents drove across the lawn to within 10 feet of the house. There was no driveway to the residence but the lawn's condition indicated that cars had previously driven across it. Trooper Foster left her car, went to the front door of the house, and asked for directions. A male occupant answered from behind a closed door and told Foster that she was not on 196th Ave. As Foster walked back to her car, she and Yarborough noticed the occupant watching her from behind a partially drawn curtain. They departed, drove to the top of 196th Ave., and circled back. As they passed Roberts's residence, they saw the occupant still peering through the drapes.

Agent Moriarty's affidavit included the above information and Moriarty's opinion that, based on past law enforcement experience, the frost-free condition of Roberts's garage roof indicated that a marijuana growing operation was being conducted in the garage because the heat generated by the halogen lights would cause the garage's roof to be free from frost when the house's roof was frosted over.

## ISSUES

I. Was the search warrant supported by probable cause?

 A. Was it proper for the magistrate to consider information obtained by the Yarborough and Foster investigation in determining probable cause?

 B. Did Fries's and the anonymous caller's tips, when considered under the totality of the circumstances, establish probable cause to believe that marijuana was located in Roberts's house and garage?

 C. Did Roberts adequately prove that Moriarty, intentionally or with reckless disregard for the truth, omitted from the affidavit information that would have negated the existence of probable cause?

II. May separate convictions and sentences be imposed under 21 U.S.C. § 841(a)(1) for both manufacture of marijuana and possession with intent to distribute the same marijuana?

## DISCUSSION

### I. *Probable Cause*

#### A. *The Yarborough and Foster Investigation*

##### 1. *Standard of Review*

The district court ruled that neither the agents' use of the private road nor the agents' approach to the door of Roberts's residence constituted a search under the Fourth Amendment. This ruling resolves questions of law that we review de novo. *Jones v. Berry,* 722 F.2d 443, 446 n. 4 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2343, 80 L.Ed.2d 817 (1984).

##### 2. *Analysis*

Since *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the scope of Fourth Amendment protection against unreasonable searches and seizures extends to those areas in which a person has a "reasonable expectation of privacy." *Id.* 389 U.S. at 360–61, 88

S.Ct. at 516 (Harlan, J., concurring). *See Oliver v. United States,* — U.S. ——, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984). Under the exclusionary rule, law enforcement officers may not use information obtained in violation of the Fourth Amendment to establish probable cause justifying a search.[4]

### a. The Private Road

Roberts argues that he had a reasonable expectation of privacy in 196th Ave. and that the observations of Yarborough and Foster, a product of their drive up 196th Ave., should have been excluded from the magistrate's probable cause determination. In his concurring opinion in *Katz,* Justice Harlan stated that the Fourth Amendment protects those areas in which a person exhibits an actual (subjective) expectation of privacy and the expectation is one that society is prepared to recognize as reasonable. 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). By posting the "No Trespassing" and "Private Property Keep Out" signs, Roberts and the other residents along the road exhibited a subjective expectation of privacy. We must decide whether that expectation is one that society recognizes as reasonable.

Recently, in *Oliver v. United States,* — U.S. ——, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984), the Court reaffirmed the vitality of the open fields doctrine. The Court agreed with Justice Holmes' conclusion in *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Id.* 265 U.S. at 59, 44 S.Ct. at 446, *quoted in Oliver,* 104 S.Ct. at 1740. The *Oliver* Court followed *Hester* in holding that "an individual may not legitimate-

ly demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." 104 S.Ct. at 1741.

The *Oliver* Court also reaffirmed the common law distinction between "open fields" and the "curtilage." Defining the curtilage as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" the Court approved the practice of extending Fourth Amendment protection of the house to the area immediately surrounding it. *Id.* at 1742 (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)).

The Court justified its refusal to extend the same protection to open fields by observing that, in contrast to a house and its curtilage, "open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance" and that, "as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office or commercial structure would not be." *Id.* 104 S.Ct. at 1741. For these reasons, the Court concluded that "the asserted expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable.'" *Id.* (footnote omitted).

■ To determine whether the agents' entry onto the road was a search, we must decide whether the private road in this case is within the curtilage of Roberts's residence or belongs instead in the same category as an open field. We find that the unobstructed road, akin to an open field, is not within the curtilage and that Roberts's asserted expectation of privacy in the road is unreasonable by society's standards.

A shared unobstructed road is incongruent with the common law concept of the curtilage as "the area around the home to

---

4. In *United States v. Leon,* — U.S. ——, 104 S.Ct. 3405, 3412–23, 82 L.Ed.2d 677 (1984), the Supreme Court recently created a "good faith exception" to the Fourth Amendment exclusionary rule. The exception applies when officers act in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid. *Id.* The exception, not raised by the Government, is inapplicable here because we find that the search warrant issued in the instant case was valid.

which the activity of home life extends." *Oliver,* 104 S.Ct. at 1743 n. 12. Used in common with residents of five other houses, the private road is only a means to reach a public road. The private road does not provide the setting for intimate activities of home life. The activities conducted on a road—driving a car, riding a bike, or walking—are impersonal, public activities. Moreover, the road is easily accessible to utility companies and police and fire departments and it is reasonable to assume that the residents would expect these public agencies to use the road in performing their services. Finally, if the road were within the curtilage, the boundaries of the curtilage could conceivably extend indefinitely. For these reasons, the agents' conduct in driving up the road did not constitute a search.

Roberts attempts to distinguish the private road from an open field by two implausible arguments: (1) that the "No Trespassing" and "Private Property Keep Out" signs created a reasonable expectation of privacy, and (2) that the road is similar to the common areas—hallways, etc.—in an apartment building. We address each of these arguments in order.

■ First, the Supreme Court dismissed a similar argument as irrelevant in *Oliver.* The Court stated the defendants' conduct—planting marijuana on secluded land, erecting fences and posting no trespassing signs around the property—did not demonstrate that their expectation of privacy was *"legitimate"* in the sense the Fourth Amendment requires. 104 S.Ct. at 1743. "The test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Id.* (footnote omitted). In the circumstances presented, the no trespassing signs were not sufficient to turn an unobstructed private road into an area for protected intimate activities.

Second, although Roberts's analogy of the road to protected common areas of an apartment building is superficially appeal-

ing, it does not withstand close scrutiny. In cases holding that the defendant had a reasonable expectation of privacy in the hallway of his apartment building, the common door to the building was locked and entry controlled solely by the defendant or by a very limited number of co-tenants. *See e.g., United States v. Fluker,* 543 F.2d 709, 716 (9th Cir.1976) ("the entry way was one to which access was clearly limited as a matter of right to the occupants of the two basement apartments, and it is undisputed that the outer doorway was always locked and that only the occupants of the two apartments and the landlord had keys thereto.").

Thus, even if we considered the private road in this case analogous to a hallway in an apartment building, precedent would not support finding Roberts's expectation of privacy reasonable because (1) there was no locked gate at the intersection of 196th Ave. and East Lake Sammamish Road and (2) the residents of the five other homes on 196th Ave. shared access to the road. Any person passing by could have easily driven up 196th Ave. Moreover, Roberts had no control over the five other homeowners: they could have invited anyone, including police officers, to drive up the road.

In short, the district court correctly denied Roberts's motion to suppress Yarborough and Foster's observations of the frost-free garage roof and covered windows. The magistrate properly considered those observations in determining that probable cause existed.

b. Approach to the Residence

■ Here again, the question is whether Roberts's expectation of privacy in the area of government intrusion is one that society recognizes as reasonable. Unlike the intrusion onto the road, however, the agents' approach to Roberts's residence was within the curtilage of the house. Nevertheless, precedent on this issue indicates that their intrusion was not an impermissible one.

In *United States v. Hersh,* 464 F.2d 228 (9th Cir.) (per curiam), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301

(1972), two deputy sheriffs, acting without a warrant, walked up to and knocked on the front door of the defendant's home. While standing on the front porch, they peered through a window and saw drugs and drug paraphernalia. On the basis of these observations, they arrested the defendant the next day and seized the drugs and paraphernalia as part of a search incident to the arrest. We held that the observations through the window did not violate the Fourth Amendment and quoted *Davis v. United States*, 327 F.2d 301 (9th Cir. 1964), for the proposition that anyone may "openly and peaceably, at high noon ... walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law." *Id.* at 303, *quoted in Hersh*, 464 F.2d at 230. In the instant case, the agents approached Roberts's door at 12:15 in the afternoon to ask the occupant questions. Under *Hersh*, their observations properly contributed to establishing probable cause.[5]

Our holding here does not conflict with *Pendleton v. Nelson*, 404 F.2d 1074 (9th Cir.1968) and *United States v. Pacheco-Ruiz*, 549 F.2d 1204 (9th Cir.1976). In both cases the officers not only made observations but at the same time seized evidence on the basis of those observations.

In each case we declined to address the issue whether a search took place and focused instead on the unreasonableness of the seizure when the officers could have obtained a warrant but did not do so. *Pendleton*, 404 F.2d at 1077; *Pacheco-Ruiz*, 549 F.2d at 1207. Here, however, the agents did obtain a warrant before entering the house and seizing evidence.

We therefore hold that the magistrate properly considered the agents' observations of the occupant's behavior in determining that probable cause existed, and the district court correctly denied Roberts's motion to suppress.

B. *The Two Tips*

1. *Standard of Review*

The Supreme Court's recent decision in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), replaced the *Aguilar-Spinelli*[6] "two-prong" test of the reliability of informants' tips with a "totality of the circumstances" approach. The Court adopted this new approach because "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." 103 S.Ct. at 2328. Under this new test, the issuing magistrate looks at an informant's "veracity," "reliability," and "basis of knowledge" under the totality of the circumstances in determining the value of the informant's report in establishing probable cause. *Id.* at 2327–28. Unlike the *Aguilar-Spinelli* test, which required the tip independently to satisfy both the veracity/reliability and basis of knowledge criteria, the *Gates* test permits a deficiency in one criterion to be compensated by a strong showing in another, or by some other indicia of reliability. *Id.* at 2329. The magistrate's task is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 2332.

The *Gates* Court reiterated that "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). The Court

---

**5.** *See also United States v. Humphries*, 636 F.2d 1172 (9th Cir.1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981) (agent's trespass onto a private driveway to determine the license plate number of a car parked in the driveway did not violate the Fourth Amendment).

**6.** *See Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

warned . that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." Rather, "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Id.* at 2331 (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)); *see United States v. Seybold,* 726 F.2d 502, 503 (9th Cir.1984).

### 2. *Analysis*

#### a. Fries's Tip

Roberts argues that Fries's tip was not a sufficiently reliable basis for establishing probable cause. Roberts concedes that the tip was against Fries's penal interest because Fries admitted that he broke into Roberts's residence. Roberts, however, points to two reasons why the magistrate should not have considered Fries's tip in determining probable cause—Fries did not indicate when he had broken into Roberts's residence and did not offer any reason to believe that the marijuana growing operation was ongoing.

In the leading case on admissions against penal interest, *United States v. Harris,* 403 U.S. 573, 583–84, 91 S.Ct. 2075, 2081–82, 29 L.Ed.2d 723 (1971), the Court noted that "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." The Court conceded that "admissions of crime do not always lend credibility to contemporaneous or later accusations of another," but found that in the case before it the admission was sufficient to establish probable cause because the informant admitted to committing currently and over a long period of time the crime that provided him with the information. *Id.*

 In our case, Fries admitted to having "broken in" but did not say when the entry occurred. So it is arguable that

Fries's tip would not, standing alone, be sufficient to establish probable cause—it gave no indication that a marijuana growing operation was currently in existence at Roberts's residence. Nevertheless, under *Gates,* the magistrate considered the tip under the totality of the circumstances and this court must accord his finding of probable cause great deference. 103 S.Ct. at 2328, 2331. Although Fries's tip may not have established probable cause by itself, when considered in conjunction with the anonymous caller's tip and the agents' observations, it contributes to the conclusion that there was a fair probability that contraband would be found at Roberts's residence.

#### b. Anonymous Caller's Tip

Roberts argues that the magistrate should not have considered this tip in determining probable cause because (1) the caller gave no indication that his information was based on personal knowledge or a reliable source, and (2) DEA Agent Moriarty made material misrepresentations in paraphrasing the tip in his affidavit.

As to the first argument, it is true that the caller did not say how he obtained his information. Standing alone, the tip could very well have been the type of "casual rumor circulating in the underworld or ... accusation based merely on an individual's general reputation" that the Court frowned upon in *Spinelli,* 393 U.S. at 416, 89 S.Ct. at 589. However, when the tip is considered under the totality of the circumstances, including Fries's tip and the agents' observations, it plays an important part in establishing probable cause to search Roberts's residence. The fact that both Fries and the caller reported a marijuana growing operation, corroborated by the frost-free garage roof and covered windows, supports the magistrate's determination of probable cause.[7]

---

**7.** In *Gates,* the Court upheld the magistrate's finding of probable cause even though the tip provided "virtually nothing from which one might conclude that its author is either honest or his information reliable" and gave "absolute-

ly no indication of the basis of the writer's predictions regarding the Gates' criminal activities." 103 S.Ct. at 2326. Because the police corroborated a number of the facts set forth in the tip—all innocent activities on their face—the

■ As to Roberts's second argument, a simple comparison of the caller's actual words and Moriarty's paraphrase indicates that the magistrate's finding of probable cause was not based on a substantial misrepresentation. The Moriarty affidavit stated that "[a]ccording to the citizen caller, a marijuana growing operation was about to be moved as a result of Fries's arrest" and "the citizen said that the operator was paranoid due to Fries's arrest and planned to move the operation this weekend." The caller's exact words were:

> So, you know, if making that arrest in for yesterday, I think if you'd move fast on this one down here you'd still pick up—they may be using this house to—to move everything out of. In the paper it said it was a Los Angeles based group moving things into Seattle.

Roberts emphasizes that, contrary to Moriarty's statement in the affidavit, the caller did not say that the operation was going to be moved that weekend because of Fries's arrest. Although the caller did not explicitly say so, it is a reasonable inference from his statements. Moreover, Roberts did not produce any evidence, as *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) requires,[8] that Moriarty, intentionally or recklessly, misquoted the caller. Finally, probable cause to believe that marijuana was located at Roberts's residence would exist regardless of whether the operators planned to move the operation in the future. In short, any inaccuracies in Moriarty's paraphrase did not affect the validity of the magistrate's probable cause determination.

### c. Probable Cause as to the House

Roberts asserts that even if probable cause was established as to the garage, it was not established as to the house. Citing *United States v. Hinton*, 219 F.2d 324, 325–26 (7th Cir.1955), for the proposition that there must be probable cause for each unit searched, he argues that the warrant was overbroad and the district court should

have excluded the items seized in the house as the fruit of an illegal search.

■ This argument fails for two reasons. First, we find that the information in Moriarty's affidavit does support probable cause to search the house. Randy Fries said that the operation was in his brother's "place," not merely in his garage. In addition, the conduct of the occupant—refusing to open the door, denying that it was 196th Ave., and peering out from behind a drawn curtain—might suggest that he was hiding something in the house. We give the magistrate's determination of probable cause great deference and uphold his authorization to search the house.

■ Second, we note that the holding of *Hinton* is limited to separate occupancy units. If the defendant uses the whole building as a single unit or is in control of the entire premises, the entire premises are suspect. See our discussion of *Hinton* in *United States v. Whitney*, 633 F.2d 902, 907 & n. 3 (9th Cir.1980), *cert. denied*, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981); *see also U.S. v. Whitten*, 706 F.2d 1000, 1008 (9th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). There was every indication here that Roberts was using the garage and house as a single unit. Therefore, the search of both was not overbroad and the district court properly admitted evidence obtained from the house.

### C. *Intentional or Reckless Omission*
#### 1. *Standard of Review*

■ In *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978), the Supreme Court held that a defendant may have false statements excised from a search warrant affidavit if he shows that the affiant made the false statements intentionally or with reckless disregard for the truth. The determinations that the statements were false and that the affiant made them intentionally or reckless-

---

Court held the tip sufficiently reliable under the totality of circumstances to support a finding of probable cause. *Id.* at 2334–36.

8. See the discussion of *Franks* at p. 5005, *infra.*

ly resolve questions of fact, which we review under the "clearly erroneous" standard. *United States v. Snowadzki,* 723 F.2d 1427, 1429 (9th Cir.1984) (findings of fact at suppression hearing are reviewed under "clearly erroneous" standard). Although the district court denied Roberts's motion to suppress, it did not explicitly decide whether DEA Agent Moriarty deliberately or recklessly omitted material from the affidavit that would have negated probable cause. Nevertheless, deciding this issue de novo, we agree with the district court's denial of Roberts's motion to suppress.

### 2. *Analysis*

■ Roberts argues that Agent Yarborough knew that a surge in electrical consumption, normally caused by indoor marijuana growing operations, did not occur at Roberts's residence, but omitted this information from the underlying affidavit. Even assuming that Roberts may attack the warrant because of an omission,[9] he nevertheless failed to produce sufficient evidence to show that either Yarborough or Moriarty intentionally or recklessly omitted the information on the lack of power surge.[10] Moreover, even if included in the affidavit, such information would not be sufficient to negate probable cause.[11] The absence of a noticeable increase in energy consumption is not critical because the

record shows that a clever grower could bypass the meter and prevent the electric company from recording the increase.

For these reasons, we find no error in the admission of evidence obtained from Roberts's residence even though the warrant affidavit omitted information relating to the absence of a power surge.

### II. *Conviction and Sentencing Under Section 841(a)(1)*

#### A. *Standard of Review*

■ The district court convicted and sentenced Roberts under 21 U.S.C. § 841(a)(1) (1982) for both manufacture of and possession with intent to distribute marijuana. The court's interpretation of the statute involves a question of law, which we review de novo. *Jones v. Berry,* 722 F.2d 443, 446 n. 4 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2343, 80 L.Ed.2d 817 (1984).

#### B. *Analysis*

The relevant section of the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 841, provides that:

"(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to *manufacture,* distribute, or dispense, or *possess with intent to* manu-

---

**9.** *See United States v. Lefkowitz,* 618 F.2d 1313, 1317 n. 3 (9th Cir.) (open question whether *Franks* permits attacks on "affidavits marred by *omissions* of facts"), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980).

**10.** The *Franks* Court explicitly limited the reach of its holding, stating that "[t]he deliberate falsity or reckless disregard whose impeachment is permitted today is *only that of the affiant,* not of any non-governmental informant." 438 U.S. at 171, 98 S.Ct. at 2684 (emphasis added). In our case, Agent Moriarty was the affiant. But Agent Yarborough, who was not an affiant, supplied Moriarty with the information used to prepare the affidavit.

We note that if defendants are precluded from attacking information given by non-affiant officers such as Yarborough, then any officer could circumvent *Franks* simply by filtering information through a second officer, acting as the affiant. We assume, therefore, for purposes

of this appeal, that Roberts could attack an intentional or reckless misstatement by either Yarborough or Moriarty. As we note above, however, Roberts has failed to prove that either agent intentionally or recklessly omitted from the affidavit information concerning the lack of power surge.

**11.** The *Franks* Court noted that no attack is possible "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause ...." 438 U.S. at 171–72, 98 S.Ct. at 2684. *See, e.g., U.S. v. Estrada,* 733 F.2d 683, 686 (9th Cir.), *cert. denied sub nom. Gorman v. United States,* —— U.S. ——, 105 S.Ct. 194, 83 L.Ed.2d 127 (1984); *United States v. Lefkowitz,* 618 F.2d 1313, 1317 (9th Cir.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980).

facture, *distribute,* or dispense, a controlled substance ...."

(Emphasis added.)

Roberts raises a question of first impression by challenging his conviction for both manufacture of and possession with intent to distribute the same marijuana under § 841(a)(1). Arguing that Congress did not intend to punish separately for the possession with intent offenses (possession with intent to manufacture, distribute, or dispense) and the completed offenses (manufacturing, distributing, and dispensing), Roberts urges us to adopt the dissent's position in *United States v. Gomez,* 593 F.2d 210, 220–23 (3d Cir.) (en banc), *cert. denied,* 441 U.S. 948, 99 S.Ct. 2172, 60 L.Ed.2d 1052 (1979). Robert's contention, however, is based on an entirely different fact situation from that in *Gomez,* or from that in this court's decision in *United States v. Oropeza,* 564 F.2d 316, 323–24 (1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978).

Unlike Gomez, who was convicted of both possession with intent to distribute and distribution of the same cocaine, Roberts was convicted of possession with intent to accomplish a crime (distribution of marijuana) different from the completed crime (manufacture of marijuana) of which he was also convicted. The dissent's concern in *Gomez* that the defendant not be convicted twice for the same criminal act— the completed crime and the lesser included offense of possession with intent to accomplish that same crime—is not at issue in Roberts's case. It is clearly possible to manufacture marijuana without possessing it with the intent to distribute it to third parties—i.e., by growing it for personal use.

Similarly, in *Oropeza,* we dealt with separate sentences for the crimes of possession with intent to distribute and for distribution of the same heroin. *Oropeza* is consequently of no more help to Roberts than *Gomez* is. We therefore uphold the district court's imposition of separate sentences for manufacture and possession with intent to distribute under § 841(a)(1).

CONCLUSION

Roberts's conviction is AFFIRMED on all three counts.