UNITED STATES of America, Plaintiff,

v.

Danielle FOX, et al., Defendants.

No. CR–S–91–102–PMP (LRL).

United States District Court,
D. Nevada.

March 24, 1992.

Thomas R. Green, Asst. U.S. Atty., Las Vegas, Nev., for the U.S.

Oscar Goodman, Las Vegas, Nev., for defendant Austin.

Kristine K. Smith, Asst. Federal Public Defender, Las Vegas, Nev., for defendant Fox.

Geraldine K. Hughes, Las Vegas, Nev., for defendant Murdock.

## ORDER

PRO, District Judge.

On July 5, 1991, Defendants filed a Motion to Suppress (# 34), a Supplement (# 46) and Amended Supplement thereto on August 20 and 21, 1991, respectively. The Government filed a Response to Defendants' Motion (# 42) on July 5, 1991. On December 31, 1991, Magistrate Judge Leavitt entered a Report and Recommendation (# 68) recommending the denial of Defendants' above-referenced Motion. After a Stipulation to Continue the Deadline for filing Objections was approved by the

Court, Defendants filed a Joint Objection (# 71) on February 28, 1992, in accordance with Local Rule 510.2 of the Rules of Practice of the United States District Court for the District of Nevada, to which the Government Responded (# 75) on March 20, 1992. On March 23, 1992, the Clerk of Court referred Defendants' Motion to the undersigned for consideration.

The Court has conducted a *de novo* review of the record in this case in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Local Rule 510.2 and finds that the evidence supports the factual findings set forth in Judge Leavitt's Report and Recommendation entered December 31, 1991.

IT IS THEREFORE ORDERED that the Report and Recommendation of Magistrate Judge Leavitt entered December 31, 1991 (# 68) is affirmed and Defendants' Motion to Suppress (# 34) is denied.

United States of America, Plaintiff,

v.

Curtis Austin, Danielle Fox and Crystal Murdock, Defendants.

## REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE

(Motion to Suppress—# 34)

Received and Filed Dec. 31, 1991

LEAVITT, United States Magistrate Judge.

The defendants have been charged in a five-count indictment with conspiracy to distribute cocaine; possession with the intent to distribute cocaine, heroin and marijuana; and using and carrying a firearm during and in relation to a drug trafficking crime; in violation of 21 U.S.C. §§ 846 and 841(a)(1), and 18 U.S.C. § 924(c)(1), respectively. They have filed a Joint Motion to Suppress (# 34, filed July 5, 1991), in which they seek an order suppressing as evidence all the items seized by the police from Murdock's apartment on April 3, 1991, pursuant to a search warrant issued by a local justice of the peace.

The defendants contend that (1) the affidavit on which the search warrant was based does not support a finding of probable cause because it contains false or misleading statements and material omissions which were made either deliberately or with reckless disregard for the truth; and (2) the manner in which the police executed the warrant, namely, by breaking into the apartment without first knocking and announcing their identity and purpose, was unlawful.

### 1. *The Evidence*

On April 3, 1991, at approximately 11:00 p.m., a search warrant was issued by Justice of the Peace William Jansen directing the police to search an apartment at 6800 E. Lake Mead Boulevard in Las Vegas for cocaine, drug paraphernalia and documents identifying the possessor of the premises. The affidavit in support of the warrant was sworn to by Detective Ray Sheffer of the Las Vegas Metropolitan Police Department (Metro).[1] Shortly thereafter the warrant

---

**1.** The search warrant and affidavit are attached as exhibits to the government's Response (# 42). The affidavit, which was drafted on April 3, 1991, states in essence that a confidential informant (hereafter "C/I"), who has not previously been proven to be reliable but whose information in this case has been verified by the police, advised Det. Sheffer that for a number of months Curtis Austin has been transporting heroin and cocaine from Southern California to Clark County, Nevada, where an associate, Danielle Fox, has been distributing the drugs for Austin. The C/I stated that Austin delivers the drugs to Fox at an apartment where Fox frequently stays located at 6800 East Lake Mead Boulevard. The details which the police verified are biographical and identificatory in nature, e.g., the arrest or conviction record of Austin and Fox, the types of vehicles which they

drive, and Fox's connection with the apartment on East Lake Mead Boulevard.

The affidavit goes on to relate that within the past several days the C/I told Sheffer that Austin and his girlfriend Sharon Bishop are presently in Southern California to pick up and deliver a large quantity of heroin or cocaine or both to the Las Vegas area on April 3, 1991. The vehicles which the C/I said Austin might use on the trip were found by Sheffer to be registered to Austin's wife.

The balance of the affidavit sets forth surveillance information which confirmed that on April 3 one of Austin's wife's vehicles and another vehicle registered to Austin's girlfriend, Sharon Bishop, did travel together from Southern California to the apartment on East Lake Mead Boulevard, with an intermediate stop in an area

was executed by Metro police officers. Initial entry was made unannounced and forcibly by officers of the SWAT unit. The defendants Fox and Murdock were inside the apartment and were arrested. Seized, among other things, were a large quantity of drugs and several firearms.

The April 3 raid and ensuing arrests of the defendants brought to a close an investigation which had begun two and a half weeks earlier into the alleged drug trafficking activities of defendant Curtis Austin. On March 15, 1991, Det. Sheffer was informed that a woman by the name of Sharon Bishop wished to talk to the police about Austin's drug distribution organization. Sheffer responded to the emergency room at Valley Hospital, where Bishop was being treated for head wounds which she claimed were the result of a pistol whipping by Austin. Bishop told Sheffer she was giving this information to the police to get even with Austin for beating her and to protect herself against being arrested for her own admitted involvement in Austin's drug trafficking activities.

During the interview with Sheffer at the hospital, and during another interview later that day in the DEA office with Sheffer and Special Agent Patrick Dawson, Bishop said that she had been Austin's girlfriend for the past eight months, during which time she had been working as an accountant in Austin's drug distributing organization. She said that Austin was regularly transporting between two and nine kilograms of cocaine and heroin per week from Southern California into Clark County, Nevada. According to Bishop, the drugs were then being distributed locally for Austin by Danielle Fox, who was a "gang banger" (i.e., a member of a street gang) and who

at one time had been arrested for murder. She admitted that she had been a heroin user herself, though she did not appear to be a user at the time of the interviews. A records check through SCOPE and NCIC revealed a pending local embezzlement charge against her. Although the subject of paying her money for her cooperation "might have come up," no agreement was made with her either to pay her money, to assist her with the pending embezzlement charge or to immunize her from prosecution for her illegal activities in Austin's organization. Sheffer did tell her, however, that her assistance to law enforcement would be kept confidential.

Following up on Bishop's statements that Fox was a "gang banger" who had been arrested for murder, Sheffer ran Fox's name in SCOPE and found that Fox had indeed been arrested for murder. The record further reflected that the charge had been dismissed. SCOPE also contained an entry which indicated possible gang affiliation. Sheffer called Metro's Gang Unit, and was advised that Fox was "a self-admitted member of the Gerson Park Kingsmen," which Sheffer believed was affiliated with a gang known as the "Crips."[2]

In response to his inquiry concerning the murder charge, Sheffer was provided with the District Attorney's case file. The only document in the file which he read was the affidavit of W.R. Vanlandschoot, an officer with the North Las Vegas Police Department (NLVPD). This affidavit had been submitted to the District Attorney in support of Vanlandschoot's application for an arrest warrant, and was Sheffer's sole source of information concerning the de-

of North Las Vegas "with a high incidence of heroin dealing." Upon arrival at the East Lake Mead Boulevard apartment, one of the occupants of the vehicles carried a large, dark colored bag into the residence. Much of the surveillance information was handwritten onto the otherwise typed affidavit because the information was continuously being provided by telephone or radio to Sheffer until moments before he went to Judge Jansen's house.

**2.** Government's Exhibit 1 is a Metro Subject Identification Card maintained by the Gang

Unit, and was the source of the information which was provided to Sheffer over the telephone. It reflects that the information contained thereon was provided to Metro's Gang Unit by an unidentified detective with the North Las Vegas Police Department on or about December 30, 1989.

In his affidavit in support of the search warrant Sheffer wrote: "I have also checked with the LVMPD Gang Unit and learned that DANIELLE FOX is a documented member of a local "Crips" gang.

tails of the murder case against Fox.[3] The Vanlandschoot affidavit essentially describes the circumstances surrounding a drug-related murder. The identification of Fox as the perpetrator was based on information provided by a convicted murderer named Alfred Adams. The Vanlandschoot affidavit reflected that although Adams had originally told the police he had seen nothing and did not know who the killer was, three weeks later, when he was in jail on loitering and drug charges, Adams changed his story and identified Fox as the killer.[4]

During the two and a half weeks following their initial contact, Bishop regularly provided Sheffer with up-to-date information on Austin's activities and associates. On April 3, Bishop advised Sheffer that she and Austin would be delivering a large quantity of drugs that night from Southern California to Murdock's apartment at 6800 E. Lake Mead Boulevard. Bishop provided a description of the cars that would be used, and the route that would be taken from California. She also informed Sheffer that in Murdock's apartment there were a number of weapons, including an AK–47, an Uzi, and some shotguns, one of which was usually propped up against the wall just inside the front door. Sheffer assured her that the police would not make their move until after she had gotten away from the premises.

Sheffer and Deputy District Attorney Thomas Leen then sat down to draft an affidavit in support of a search warrant. Concerned for Bishop's safety and her viability as a continuing source of information, they were confronted with the question of how to keep her identity confidential. Leen testified that because there was no provision under state law for the sealing of search warrant affidavits, it did not occur to him to request a sealing order.[5] They did not simply refer to Bishop as a confidential informant because presumably the information was so individualized that Bishop's identity would be apparent to anyone in Austin's organization who read the affidavit. Instead they disguised Bishop's identity by creating a *fictitious informant* and attributing to that informant the information Bishop provided about Austin and herself.[6] As to the so-called informant's reliability, the affidavit states, at page 2: "To my knowledge, the C/I has not been previously been (sic) proven to be reliable in the capacity of a police informant, however, as will be detailed in this affidavit,

---

**3.** The Vanlandschoot affidavit is attached to the defendants' motion (# 34) as Exhibit "E".

**4.** In his affidavit in support of the search warrant here at issue, Sheffer states that he looked into Bishop's claim that Fox had been arrested for murder. He states:

From reviewing police files in this case, it appears that a person named KIP CARPENTER was murdered on December 6, 1989, near West Carey and Martin Luther King Boulevard while he was at that location to purchase narcotics. This information was confirmed by a person named TRAVIS DEMPSEY who went with the victim to that location for that purpose. A person named ALFRED ADAMS told police that he had been an eye witness to the murder and had seen DANIELLE FOX shoot the victim. Mr. ADAMS was a convicted felon for murder himself, was currently being held on narcotics charges and ultimately failed and refused to appear and testify in court. Accordingly, in August of 1990, the murder charges against DANIELLE FOX were dismissed.

**5.** The Court finds it difficult to reconcile this testimony with the affidavit which Leen himself

composed. The affidavit, at page 7, expressly requested a sealing order.

**6.** Hence, the following language on page 5 of the affidavit:

Within the past several days the C/I told me that CURTIS AUSTIN is now in the Southern California area in the company of a black female adult known as "YO YO." My personal investigation has disclosed that "YO YO" is the alias of a black female adult whose true name is SHARON BISHOP, being born August 6, 1956, and being 5'5" tall, 130 pounds. I know from my personal investigation in this case that Ms. BISHOP is a frequent associate and girlfriend of CURTIS AUSTIN. The C/I told me that at the present time CURTIS AUSTIN and "YO YO" are in the Southern California area for the purposes (sic) of picking up a large quantity of narcotics, either cocaine or heroin or both with the intention of transporting these narcotics back to Clark County, Nevada. In fact, the C/I told me that the two mentioned persons would probably return to the Las Vegas area within a 24 hour period beginning in the morning hours of April 3, 1991.

every piece of information given to myself (sic) by the C/I in this case has been checked out by myself (sic) and/or other police officials and has proven to be accurate including the particulars as set forth herein." [7]

When the affidavit was completed, and included the last-minute, handwritten surveillance information, Leen and Sheffer went to Judge Jansen's home. What happened after Jansen read the affidavit and was about to administer the oath to Sheffer is the subject of conflicting testimony. Both Sheffer and Leen testified that before the oath was administered, Leen told Jansen that the informant was in fact Sharon Bishop.[8] Indeed, Leen testified that he had planned all along to tell the judge who the informant was.

Sheffer's account was a bit more detailed. He testified that Leen said to Jansen, "Your Honor, this is an important point: if you haven't figured it out, Sharon Bishop is the informant in this case; it's very important you know it's Sharon Bishop." According to Sheffer, when Jansen did not respond, Sheffer repeated what Leen said, and added that they prepared the affidavit that way in order to protect Bishop's identity. Jansen replied, "That's unusual, but I understand." Jansen then administered the oath to Sheffer.

Jansen testified that he could recall no such conversation. He recalled only that he studied the affidavit, was satisfied it supported the issuance of a search warrant, administered the oath and signed the warrant. There was, according to Jansen's best recollection, no other conversation that night about the substance of the affidavit.

Leen further testified that about ten days later he saw Jansen on the street and asked him whether he recalled being told the informant was Bishop. Jansen said he did not recall the conversation, but, according to Leen, suggested that the affidavit might refresh his recollection. Leen produced a copy of the affidavit, but Jansen said he couldn't recall whether the conversation took place or not.

It was Jansen's testimony that it was two to three weeks after he signed the warrant when Leen asked him, "Did we tell you who the CI was? Could you tell, based on our conversation [at the time the warrant was presented]?" Jansen testified that he replied, "No, I don't recall any conversation."

Sheffer testified that one to two months ago (i.e., prior to his testimony on October 31, 1991), Leen told him "there are problems with the search warrant." According to Sheffer, Leen said that Jansen didn't remember that Leen and Sheffer had told him that Sharon Bishop was the informant. Sheffer testified that he responded to Leen, "Well, I remember it."

### 2. *Discussion*

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that a search warrant affidavit valid on its face may be challenged by the accused if it can be shown that (1) the affidavit contains intentionally or recklessly false statements, and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause.

> [A]n affiant acted with reckless disregard for the truth where he " 'in fact entertained serious doubts as to the truth of his' allegations." [*U.S. v.*] *Williams*, 737 F.2d [594] at 602 [ (7th Cir.1984) ], quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (a Supreme Court case applying the *New York Times*

---

**7.** Omitted from the affidavit were the facts that (1) the real informant, Sharon Bishop, had been pistol whipped by Austin and was motivated by revenge to provide information to the police; (2) also motivating Bishop was a desire for immunity from prosecution, or at least lenient treatment, by the police or other prosecuting authorities; (3) Bishop was assured by the police that she would not be arrested on the night of the raid; and (4) Bishop had herself been a heroin user at one time.

**8.** Leen was not placed under oath by Judge Jansen, and the conversation was not recorded. Nor was any other record made of the conversation.

standard); (other citations omitted). Reckless disregard for the truth may also be proved inferentially "from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations." *Williams*, 737 F.2d at 602, quoting *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326; (other citation omitted). Mere negligence by the affiant does not constitute reckless disregard for the truth. *United States v. A Residence Loc. at 218 3rd Street*, 805 F.2d 256, 258 (7th Cir.1986).

In *United States v. Stanert*, 762 F.2d 775, 780–81 (9th Cir.1985), the Court of Appeals for the Ninth Circuit held that "the Fourth Amendment mandates that a defendant be permitted to challenge a warrant affidavit valid on its face when it contains deliberate or reckless *omissions* of facts that tend to mislead." (Emphasis added.) "A defendant challenging an affidavit must also show that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause." *Id.* at 782.

### a. Fox's Contentions

Fox complains that the assertions in the affidavit concerning his involvement with a gang and with a drug-related murder were deliberately or recklessly false and misleading. He contends that such statements were designed to give the issuing judge the erroneous impression that Fox was a drug trafficker. Fox argues that without such false and misleading information the affidavit is devoid of any information which would support Bishop's uncorroborated allegations linking him with drug trafficking.

■ As to the allegation of gang membership, the government now admits that it has no evidence that Fox was or is a gang member. Accordingly, the Court finds that Sheffer's statement that Fox was a gang member was false when made. The Court further finds that the allegation of Fox's purported gang membership very likely contributed to a finding by the issuing judge that Fox was probably involved in the trafficking of drugs. However, for the reasons that follow, the Court also finds that the false statement was made neither knowingly nor with reckless disregard for the truth.

When Sharon Bishop told Det. Sheffer that Fox was a "gang banger," Sheffer took appropriate steps to verify Bishop's allegation. He called Metro's Gang Unit, and learned that the Unit indeed had a subject identification card on Fox. He was told the card reflected that Fox was a "self-admitted" gang member. The card also reflected that the source of the information was a detective with the North Las Vegas Police Department. We know now that the information was not correct. But at the time Sheffer didn't know it was untrue, and had no reason to question it. He did what police officers must do: he assumed that information derived from records maintained by his own department was accurate. It would be unreasonable to expect police officers to insist that every piece of information they retrieve from departmental records be double-checked, especially where there is no apparent reason to doubt it. Therefore, it cannot be said that Sheffer's failure to make further inquiry, under the circumstances, was reckless. Accordingly, for the purposes of this *Franks* analysis, the statement that Fox is a documented gang member need not be redacted from the affidavit.

■ Fox also contends that Sheffer's account of the circumstances surrounding the drug-related murder was calculated to mislead the issuing judge into believing that the only reason the murder charge against Fox was dismissed was the failure of a key witness—Alfred Adams—to appear and testify against Fox at the preliminary hearing. Fox complains that Sheffer either deliberately or recklessly failed to bring to the issuing judge's attention certain other considerations that, had they been disclosed, would have weakened the issuing judge's reliance on the allegation that Fox had committed a drug-related murder: (1) Alfred Adams, the man who identified Fox as the perpetrator, had originally denied any knowledge of the shooting; (2) in return for Adams' subsequent identification of Fox as the killer, certain drug charges

on which Adams was being held were immediately dropped;[9] and (3) according to the deputy public defender assigned to represent Fox in the murder case, the State knew not only that Adams was the only witness who had identified Fox as the killer, but also that there were other witnesses who would have provided an alibi for Fox at the time of the murder.[10]

The Court agrees that the omission of the above-described information from the affidavit rendered that portion of the affidavit misleading. Had this information been included in the affidavit, a serious question would have been raised as to whether the sole reason for the dismissal of the charge was Adams' failure to testify at the preliminary hearing.

Moreover, the Court finds that Det. Sheffer's failure to discover this information reflected a reckless disregard for the truth. Sheffer testified that his sole source of information concerning the murder case was the Vanlandschoot affidavit contained in the District Attorney's file. When an experienced detective such as Sheffer learned from Vanlandschoot's affidavit that Alfred Adams, a convicted murderer, had originally denied knowledge of the murder, only to change his story once he was in custody, he should have entertained sufficient doubt about the validity of the

murder charge to cause him, at the very least, to read the entire file. Presumably a reading of the entire file would have revealed the additional information set forth above. Accordingly, for the purposes of this *Franks* analysis, the additional information will be considered in evaluating the affidavit's showing of probable cause.

#### b. Austin's Contentions

■ Austin contends that the attribution of Sharon Bishop's information to a fictitious informant was a deliberate falsehood which, under *Franks*, requires the Court to strike all of the information so attributed. Without Bishop's information, the search warrant would fall.[11]

The misrepresentation concerning the source of Bishop's information was in fact deliberate and calculated. The question is whether *Franks* requires the Court to redact the information which was falsely attributed to the fictitious informant. For the reasons that follow, the Court concludes that it does not.[12]

A remarkably similar case confronted the court in *United States v. Strini*, 658 F.2d 593 (8th Cir.1981). There one Terry Bregar, who was involved in illegal drug activities, agreed to become an informant and to assist the government covertly. Based

---

**9.** Fox does not inform the Court how he knows this. However, the government does not dispute the assertion. The Court therefore accepts it as accurate.

**10.** The affidavit of David S. Gibson is attached to Fox's motion (#34) as Exhibit F.

**11.** Austin also contends that the testimony of Leen and Sheffer, which was that they told Judge Jansen that Bishop was the informant, should be rejected as false. The Court disagrees. The Court does not believe that Leen would approach Judge Jansen some time later and attempt to plant a false seed in the judge's mind. It is far more likely that Judge Jansen simply forgot he was told who the informant was than that Leen engaged in a Machiavellian scheme to manipulate the judge's memory in anticipation of litigation over the validity of a search warrant.

Of course Leen was concerned about the decision to create a fictitious informant. Why else would he discuss the matter with Judge Jansen afterwards? Indeed, Leen originally told the

judge who the informant was precisely because he was uncomfortable with the misleading character of the affidavit. Leen's discomfort was, of course, well founded. He tendered a deliberately misleading affidavit to a judge. His oral representations to the judge were unsworn, and no record was made of them. And in the name of "setting the record straight" so that the judge would not be deceived, he nevertheless asked the judge to swear Sheffer to the truth of statements which everyone knew were false! The Court does not condone such shenanigans, no matter how noble the motives that prompted them.

**12.** At oral argument Austin urged the Court to follow the example of Judge Thompson in *United States v. Swanson*, 399 F.Supp. 441 (D.Nev. 1975), and suppress the evidence solely on the ground that the affidavit contains a reckless or intentional material misrepresentation of fact relevant to the showing of probable cause. *Swanson* was decided three years before *Franks*, and employed an analysis which is no longer viable.

largely on Bregar's information, a federal agent drafted a search warrant affidavit, in which Bregar's information was attributed to a "third unnamed confidential informant." *Id.* at 594. That information related to covert transactions between Bregar and Strini. The judge who approved the warrant was not told that Bregar was in fact the "informant." *Id.* at 595.

Following his conviction, Strini attacked the validity of the search warrant on the ground that the affidavit's failure to disclose Bregar as the informant, and the characterization of him instead as a "third confidential informant," amounted to a deliberate falsehood requiring the redaction of all the information that Bregar provided. The government argued, much as the government argues here, that the affidavit was drafted in such a way as to protect Bregar and to ensure his continuing viability in on-going investigations.

Applying the *Franks* analysis, the court held that the failure to disclose that Bregar was the real informant was not a false statement within the contemplation of *Franks*. In upholding the validity of the warrant the court said:

> While we do not condone the action, this was not an attempt to enhance the contents of the affidavit submitted in support of the search warrant. Rather, it was a measure used to mask the identity of the informant which was necessary for his safety and for his usefulness in on-going investigations.
>
> \* \* \* \* \* \*
>
> Furthermore, even if the statement was a "false statement" within the contemplation of *Franks, supra,* the district court did not err in concluding the evidence should not be suppressed. The *Franks* rule requires that the perjured information be set aside. Then, the remainder of the information can be examined to determine whether there is probable cause. If there is probable cause, the search warrant will not be invalid.

*Id.* at 597. The court found that the falsity, if any, related to the *identity* of the informant, not to the *information* which the informant provided. Finding that the information itself provided probable cause, the court concluded that "[a]ppellant suffered no prejudice due to the masking of informant's true identity. The masking of the identity of the informant weakened rather than strengthened the showing of probable cause to the court." *Id.* at 598.

A similar situation existed in *United States v. Clutter,* 914 F.2d 775 (6th Cir. 1990), where, in upholding the search warrant in question, the court observed:

> In addition, while the judge who issued the search warrant might have been misled into believing that Spaw and the confidential informant were two different persons, that misconception would not have been crucial to establishing probable cause. Defendants have not pointed to any facts recited in the affidavit relating to probable cause that are false. Accordingly, when one views the motivation of the police officers in drafting the affidavit in the form presented [to protect the informant], it cannot be said that they acted to deceive the judge *as to the existence of probable cause.*

*Id.* at 780 (emphasis added).

Here the information provided by Bishop relating to probable cause is unchallenged. Rather, Austin's quarrel is with the *attribution* of that information to a fictitious confidential informant. As the government points out, this was done as a good faith effort to protect the informant, not to mislead the judge as to the existence of probable cause. Therefore under *Franks* the information itself need not be stricken from the affidavit.

█ It is true that in this case, unlike *Strini* and *Clutter,* the judge was told off-the-record who the informant really was. However, he was not informed of certain facts which tended to undermine Bishop's credibility, e.g., that she had been pistol whipped by Austin and was seeking revenge against him, that she hoped to be treated leniently by the prosecuting authorities, and that she had been a heroin user. These are facts of which the judge should

have been made aware. The failure to bring them to the judge's attention amounts to a deliberate, or at the very least a reckless, material omission which this Court must take into account when determining whether the affidavit contains a sufficient showing of probable cause. The affidavit must therefore be supplemented by the omitted impeaching material. *United States v. Stanert, supra,* 762 F.2d at 782.

### c. The Affidavit Revisited

■■■ In determining whether informant information establishes probable cause, the issuing judge may look to the "totality of the circumstances." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). In *Gates,* the Supreme Court abandoned the rigid two-prong test established in *Aguilar v. Texas,* 378 U.S. 108, 113–14, 84 S.Ct. 1509, 1513–14, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 415–16, 89 S.Ct. 584, 588–89, 21 L.Ed.2d 637 (1969).

> [A]n informant's "veracity," "reliability," and "basis of knowledge" are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case, .... Rather, ... they should be understood as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.

*Illinois v. Gates,* 462 U.S. at 230, 103 S.Ct. at 2328 (footnote omitted).

> [T]he "two-pronged test" directs analysis into two largely independent channels— the informant's "veracity" or "reliability" and his "basis of knowledge." ... There are persuasive arguments against according these two elements such independent status. Instead, they are better understood as relevant considerations in

the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.

462 U.S. at 233, 103 S.Ct. at 2329.

Where an informant's veracity or reliability has not been previously demonstrated, it may nevertheless be established through the informant's own admissions against penal interest, *United States v. Roberts,* 747 F.2d 537, 544 (9th Cir.1984), or through independent police corroboration of the information provided. *United States v. Fixen,* 780 F.2d 1434, 1437–38 (9th Cir.1986). The affiant must also describe the basis of the informant's knowledge, i.e., how the informant knows what he or she purports to know. *Spinelli v. United States, supra,* 393 U.S. at 416, 89 S.Ct. at 589. Where the informant's basis is itself hearsay, and not personal knowledge, the secondary hearsay must also reflect indicia of veracity and a sound basis of knowledge. *Id.* The issuing judge must ultimately "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. at 2332.

■■■ The affidavit which was presented to Judge Jansen consisted of information provided by the informant, police verification of certain biographical and identificatory data, and reports of police surveillance. The Court has found that the affidavit should have included (1) a more complete account of the circumstances surrounding the dismissal of the murder charge against Fox and (2) the information about Sharon Bishop which was relevant to the "informant's" credibility. The Court must now determine whether the affidavit, as supplemented, contains a sufficient showing of

probable cause to justify issuance of the warrant. For the reasons that follow the Court finds that if the affidavit had disclosed all relevant information about Bishop, the showing of probable cause would have been strengthened, not weakened.

The affidavit originally provided no hint regarding the *basis* of the informant's knowledge. The informant was described only as a person of unproven reliability. In a properly supplemented affidavit the judge would have been informed that the informant's knowledge was first-hand, i.e., based not only on her personal relationship with Austin, but also on her employment as an accountant in Austin's drug organization. Moreover, in a properly supplemented affidavit the judge would have been told that the informant had participated directly in the unlawful transportation and delivery of drugs from Southern California to Las Vegas. Full disclosure of the actual basis of the informant's knowledge would have provided a far more persuasive reason for crediting her information than was set forth in the original affidavit.

The veracity or trustworthiness of the information itself would also have been enhanced if the judge had known that the informant was admitting her direct involvement in Austin's illegal activities. Admissions against penal interest are well recognized indicia of trustworthiness. *United States v. Roberts, supra.* "Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *United States v. Harris*, 403 U.S. 573, 583–84, 91 S.Ct. 2075, 2081–82, 29 L.Ed.2d 723 (1971).

Moreover, the original affidavit contained reports of police surveillance which provided compelling corroboration of the informant's information, right up to the point when the drugs were allegedly delivered to the apartment which was to be searched. For example, according to the affidavit, the informant stated that Fox regularly drove a black over silver Chevrolet Blazer. Records at the Department of Motor Vehicles reflected that Fox's mother was the owner of a black over silver Blazer bearing Nevada registration 022 DVZ. Surveillance officers positioned outside the apartment reported that at approximately 10:40 p.m. a black over silver Blazer bearing Nevada plates 022 DVZ arrived at the apartment. A black male and a black female were seen exiting the Blazer and entering the apartment. It is reasonable to infer that the two individuals were Fox and Murdock. Ten minutes later, the two vehicles which the police had been following from Southern California (carrying Austin and Bishop) arrived at the apartment. One of the occupants removed a large bag from one of the vehicles and carried it into the apartment. It is reasonable to infer that the bag contained the transported drugs. These observations by the police provided powerful corroboration of the informant's statement that the drugs were going to be delivered to Fox at Murdock's apartment.

The Court therefore finds that even if the affidavit had included the information which cast doubt on Fox's involvement in a drug-related murder and which raised questions about the informant's motivation for providing information to the police, the disclosure of the *basis* of the informant's knowledge, and the attendant enhancement of the indicia of the informant's reliability, would have served only to strengthen the showing of probable cause. The latter clearly would have outweighed the former.

### d. The No–Knock Entry

█ It is uncontroverted that prior to gaining entry to the apartment at 6800 E. Lake Mead Boulevard the police neither announced their identity and purpose nor waited to be refused admittance. It is well settled, however, that a police officer's "reasonable belief that announcement might place him or his associates in physical peril ... justifies non-compliance with the announcement provisions of the statute." *United States v. Kane*, 637 F.2d 974, 978 (3d Cir.1981). *See also United States v. McShane*, 462 F.2d 5, 6 (9th Cir.

1972); *United States v. Smith,* 456 F.2d 1236 (9th Cir.1972).

Sharon Bishop told Sheffer that Fox and Murdock had several weapons in the apartment, including an AK–47, an Uzi, and a loaded shotgun readily accessible near the front door. Sheffer also believed that Fox was a member of a violent street gang. Based on this information, the Court concludes that the officers had a reasonable basis for believing that compliance with the "knock and announce" provisions of 18 U.S.C. § 3109 [13] or NRS 179.055(1) [14] would have placed them in great peril. Their noncompliance was therefore justified.[15]

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the United States Magistrate Judge for the District of Nevada that the Joint Motion to Suppress (# 34) should be denied.

DATED this <u>30th</u> day of December, 1991.

---

**13.** 18 U.S.C. § 3109 provides:
  The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

**14.** NRS 179.055(1) provides:
  The officer may break open any outer or inner door or window of a house, or any part of the house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.

**15.** The defendants also contend that the affidavit in support of the search warrant contains no special showing justifying a nighttime search. None is required. 21 U.S.C. § 879 provides:

  A search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge or United States magistrate issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time.

The Supreme Court has construed § 879 to require "no special showing for a nighttime search, other than a showing that the contraband is likely to be on the property or person to be searched at that time." *Gooding v. United States,* 416 U.S. 430, 458, 94 S.Ct. 1780, 1793, 40 L.Ed.2d 250 (1974).